## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **A.K.,** a minor, by and through **KELLEY MOYER** | : | |
| Plaintiff | : | |
| | : | |
| **v.** | : | Civil Action No. – 1:20-cv-00392 |
| | : | |
| **CHERRY CREEK SCHOOL DISTRICT NO. 5** | : | |
| | : | |
| | : | |
| **BOARD OF EDUCATION FOR THE CHERRY CREEK SCHOOL DISTRICT** | : | Complaint – Civil Rights |
| | : | |
| **SCOTT SIEGFRIED** in his official capacity as Superintendent of Cherry Creek School District | : | |
| | : | |
| | : | |
| **CAROLL DURAN**, in her official capacity as Principal of Endeavor Academy | : | |
| | : | |
| Defendants | : | |

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

---

Plaintiff, A.K., by and through Kelley Moyer ("Moyer"), as her next friend, through her undersigned counsel, for her Complaint and Jury Demand against Defendants Cherry Creek School District No. 5 ("CCSD"), the Board of Education for the Cherry Creek School District ("School Board"), Scott Siegfried

1

("Superintendent Siegfried" or "Siegfried"), and Caroll Duran ("Principal Duran" or "Duran") (collectively "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      This is a challenge to Defendants' policies, practices, and customs that unconstitutionally infringed and continue to infringe on the fundamental, individual First, Fifth, and Fourteenth Amendment rights of Plaintiff.  Defendants suspended Plaintiff from school for five days, without any prior notice or other due process, solely because she posted a picture of herself and her older brother holding firearms, after school hours, off school property, and on a social media platform entirely unaffiliated and unrelated to her school ("Snapchat"). The photo was captioned simply with an explanation that they were heading to the gun range to exercise their Second Amendment rights and thought they would exercise their First Amendment rights while they were at it by posting the picture – unquestionably the very type of speech that the First and Fourteenth Amendment protects from government infringement and punishment. The post contained no threats and was not in any way directed at students, school officials, or school activities. Defendants threatened "additional consequences" if Plaintiff engaged in similar protected political speech in the future.

2.      Defendants' policies, practices, and customs target for censorship and punishment Plaintiff's constitutionally protected speech and expression in violation

of the First Amendment, they are vague and overbroad in violation of the Fifth and Fourteenth Amendments, and they have denied Plaintiff due process of law under the Fifth and Fourteenth Amendments. Through this Complaint, Plaintiff rightfully seeks redress for these violations of her fundamental constitutional rights.

## PARTIES

3.     Plaintiff A.K. is a seventeen-year-old high school senior at Endeavor Academy in Centennial, Colorado ("Endeavor"). She is represented by her mother and sole legal guardian, Kelley Moyer, as her next friend pursuant to F.R.C.P. 17(c)(2).

4.     Defendant Cherry Creek School District No. 5 is a public entity established and organized under, and pursuant to, the laws of Colorado. CCSD maintains its administrative office at 4700 South Yosemite Street, Greenwood Village, Colorado 80111. CCSD, through its Board of Education, has the duty and authority to control the instruction and otherwise direct and manage the essential educational and administrative policies, practices, and functions of all schools within the district (Colo. Const. Art IX, § 15), including Endeavor, and CCSD has had at all times relevant to the allegations of this Complaint such duty and authority with respect to Endeavor.

5.     Defendant Board of Education for the Cherry Creek School District is an elected body which is established by Colo. Const. Art IX, § 15 and C.R.S. § 22-32-103. The School Board governs the operations of CCSD, including the adoption and

promulgation of the policies, practices, and customs challenged herein and maintains an office at 4700 South Yosemite Street, Greenwood Village, Colorado 80111. The School Board is being sued in its official capacity.

6.     Defendant Scott Siegfried is the superintendent of Cherry Creek School District No. 5. As superintendent, Siegfried is the chief officer of CCSD and responsible for overseeing the day to day operations of the district. On information and belief, Siegfried supervises, directs, or controls in a managerial role Jennifer Perry (Assistant Superintendent of Education Operations) ("Perry" or "Assistant Superintendent"), Carla Stearns (Executive Director High School Education) ("Stearns" or "Executive Director"), and Caroll Duran (Principal of Endeavor). *See* Exhibit A. Siegfried is sued in his official capacity.

7.     Defendant Caroll Duran is the principal of Endeavor. Pursuant to a delegation of authority by CCSD, *see* C.R.S. § 22-33-105(2)(a), Principal Duran is responsible for implementing and enforcing CCSD's policies at Endeavor as a function of CCSD's authority and control over the essential instructional, educational, and administrative policies and practices at Endeavor, including the suspension policy at issue in this action. On information and belief, Duran reports to Stearns, who reports to Perry, who ultimately reports to Siegfried. *See* Exhibit A. Further, in accordance with C.R.S. § 22-32-126, Duran has assumed the administrative responsibility of Endeavor under the supervision of Siegfried. Duran is sued in her official capacity.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff seeks to vindicate her rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because the events that give rise to Plaintiff's claims occurred in this district.

## RELEVANT LAW AND POLICIES

10.     Colo. Const. Art IX, § 15 provides "[t]he general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts."

11.     C.R.S. § 22-32-103(1) states "[e]ach school district shall be governed by a board of education consisting of the number of school directors prescribed by law. Such board of education shall possess all powers delegated to a board of education or to a school district by law, and shall perform all duties required by law."

12.     C.R.S. § 22-32-109.1 requires that each school board implement a safe school plan. It further commands that "[t]he plan, at a minimum, must include…concisely written conduct and discipline code that shall be enforced uniformly, fairly, and consistently for all students…"

13.     C.R.S. § 22-32-109.1(2)(a)(I)(E) further requires that the safe school plan include "[g]eneral policies and procedures for determining the circumstances under and the manner in which disciplinary actions, including suspension and expulsion, shall be imposed in accordance with the provisions of sections 22-33-105 and 22-33-106."

14.     C.R.S. § 22-33-105(2)(a) states, *inter alia*, "…the board of education of each district may…[d]elegate to any school principal within the school district …the power to suspend a pupil in [her] school for not more than five school days."

15.     Additionally, C.R.S. § 22-32-126 declares that "[t]he principal shall assume the administrative responsibility…under the supervision of the superintendent and in accordance with the rules and regulations of the board of education, for the planning, management, operation, and evaluation of the educational program of the schools to which [s]he is assigned."

16.     C.R.S. § 22-33-106(1)(c) defines the grounds for suspension, to include "[b]ehavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel…"

17.     CCSD Policy JKD-1-E mirrors C.R.S. § 22-33-106(1)(c) in providing that "the following may be grounds for suspension, expulsion or denial of admission from a public school: [¶ … ¶] 3. Behavior on or off school property which is detrimental to the welfare or safety of other pupils or of school personnel …"

18.     CCSD Policy JICDA establishes a similar policy, in different terms, concerning conduct of students that occurs in connection with school-related activities. It provides: "The principal may suspend or recommend expulsion of a student who engages in one or more of the following specific activities while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity. … [¶ … ¶] 19. Behavior on or off school property that is detrimental to the welfare, safety, or morals of other students or school personnel."

19.     C.R.S. § 22-33-105(c) provides: "A pupil suspended for a period of ten days or less shall receive an informal hearing by the school principal or the principal's designee prior to the pupil's removal from school, unless an emergency requires immediate removal from school, in which case an informal hearing shall follow as soon after the pupil's removal as practicable."

20.     Lastly, C.R.S. § 22-33-105(c)(4) provides: "The board of education of each district shall establish, as an alternative to suspension, a policy that allows the pupil to remain in school by encouraging the parent, guardian, or legal custodian, with the consent of the pupil's teacher or teachers, to attend class with the pupil for a period of time specified by the suspending authority."

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**A. Plaintiff's Prior Snapchat Activity**

21.     Plaintiff utilizes the popular social media application Snapchat, a multimedia messaging application, for sharing messages, videos, and photographs with a variety of people in her life, including family members and friends.

22.     Snapchat allows users to post images that can be directed to select contacts, to a certain group of contacts, or that can be viewed by anyone using the application. It is an entirely public application, having no connection or affiliation with CCSD, Endeavor, or any other particular public school entity.

23.     In the mid-morning hours of October 10, 2019, Plaintiff posted on Snapchat a picture of herself with a black scarf which she wrapped around her head. The photo lacked any caption and was not directed at anyone in particular.

24.     Several of Plaintiff's volleyball teammates messaged her through the application to let her know that they believed the photo was racist. As a result, Plaintiff removed the photo.

25.     Plaintiff then reposted the photo with a caption "Allahu akbar (I live in America so fuck you if your [sic] offended, I can do what I want."

26.     Plaintiff received more complaints from teammates with threats that they would report her to the school administration for the post.

27.     As a result of the complaints, Plaintiff went to the office of Principal Duran on her own accord and "self-reported" the material she posted on Snapchat in an effort to make the school administration aware.

28.     At the time Plaintiff "self-reported" the material, Principal Duran did not reprimand Plaintiff for, or express any concern regarding, the post.

29.     Later that day, Plaintiff was called back to Principal Duran's office after other individuals had brought the post to her attention, even though Plaintiff had previously "self-reported" what she posted.

30.     During this second meeting, Principal Duran advised Plaintiff that she could not be punished for the post. Principal Duran further advised Plaintiff to be "more sensitive" about her social media posting.

## B. Plaintiff Engaged in Protected Speech After School Hours, on Private Property, and Not Directed at Any Students or the School

31.     On the evening of October 10, 2019, Plaintiff and her older brother planned to go to the Centennial Gun Club's shooting range to practice marksmanship and firearm safety.

32.     Plaintiff and her family are firearm enthusiasts, strong supporters of the First and Second Amendments, and encourage family members to regularly practice to maintain firearm proficiency.

33.     Plaintiff and her family practice what they preach by routinely and lawfully practicing marksmanship and firearm safety, including by training at the Centennial Gun Club's indoor shooting range in Centennial, Colorado. Plaintiff and

Moyer are also members of the Firearms Policy Coalition, Inc. ("FPC") and Firearms Policy Foundation ("FPF"), which are nonpartisan, nonprofit organizations that advocate for individual liberties and constitutional rights, including those protected by the First and Second Amendments.

34.    Before leaving for the shooting range, at approximately 7 p.m. on Thursday, October 10, 2019, Plaintiff posted a photo with a caption (the "Snapchat Post") to her social-media account on Snapchat.

35.    The Snapchat Post is depicted below:



36.     The Snapchat Post depicts Plaintiff and her older brother, an Army veteran, wearing shemaghs (scarves popular in Middle Eastern countries and also used for practical reasons by members of the United States military, including Plaintiff's older brother). While the attire is atypical of what one may find in a Colorado suburb, there was no suggestion that the shemaghs were or implied a threat to anyone. It also shows them giving the middle-finger gesture while holding firearms. Plaintiff is the figure on the left holding a semiautomatic pistol. The figure on the right is Plaintiff's brother holding a semiautomatic rifle.

37.     When the photo was taken, Plaintiff was on real property under the control of Moyer, and had Moyer's permission to hold the handgun, as well as to go to the shooting range with her brother.

38.     The Snapchat Post's caption reads, in its entirety:

> me and my legal guardian are going to the gun range to practice gun safety and responsible gun ownership while getting better so we can protect ourselves while also using the first amendment to practice our second ammendment [sic].

39.      The Snapchat Post was posted to Plaintiff's Snapchat account, well outside of school hours and from the privacy of Plaintiff's home. Many of Plaintiff's family and friends follow her on Snapchat. While some of her schoolmates also follow her, the post was not specifically directed at them and did not in any way mention or focus upon the school, her classmates, or anything that would distinguish it from general, publicly directed free speech.

40.     The Snapchat Post is self-evidently not an express or implied threat against anybody, let alone against Endeavor, its students or staff, or its operations or activities. The post's caption is explicitly political in that it specifically states that Plaintiff was exercising her free speech rights protected by the First Amendment to display her pride in safely and responsibly exercising her gun-ownership rights protected by the Second Amendment.

41.     Nor does anything in the Snapchat Post depict any illegal or dangerous activity, or anything else that could reasonably be construed as "detrimental to the welfare or safety of other pupils or of school personnel." Indeed, Plaintiff and her brother both display responsible firearm safety practices in the Snapchat Post. For example, both Plaintiff and her brother are exercising "trigger discipline," which is a widely recognized firearm-safety practice whereby a shooter keeps his or her index finger outside of a firearm's trigger well until ready to shoot.

## C. Defendants Suspended Plaintiff Specifically Because of Her Protected Free Speech, Employing Vague and Overbroad Standards, and Without Any Prior Notice or Due Process

42.     Along with the rest of her many connections on Snapchat, the Snapchat Post was temporarily visible to certain Endeavor classmates of Plaintiff's through their own private Snapchat accounts.

43.     The same evening the Snapchat Post was published—October 10, 2019—two of Plaintiff's classmates took screenshots of the Snapchat Post from their private accounts using the Snapchat application on their own smartphones.

12

44.     On information and belief, a parent of one of these classmates made a report to Safe2Tell Colorado about the Snapchat Post shortly after it was published. Safe2Tell is a program that allows individuals to make anonymous tips about their purported "concerns" for their safety or the safety of others connected with Colorado schools and communities.

45.     Approximately two hours after the Snapchat Post was published, at around 9 p.m., officers from the Aurora Police Department went to Plaintiff's father's house in response to a report about the Snapchat Post.

46.     When the Aurora police officers made contact with Plaintiff's father, they were apologetic about having contacted him at all. The officers told him that Plaintiff had plainly made no threat for them to "assess" for law enforcement purposes.

47.     The next morning, Plaintiff's mother Moyer—desperate to understand why the police had been called on her daughter—accompanied Plaintiff to school. Plaintiff's stepfather also accompanied Plaintiff and Moyer.

48.     Immediately upon arriving at Endeavor on the morning of October 11, 2019, Plaintiff, Moyer, and Plaintiff's stepfather were met by multiple security officers who escorted them to the office of Principal Duran.

49.     In Principal Duran's office, Plaintiff and her family were met by Principal Duran and Assistant Principal Matt Larson. During the meeting, an Arapahoe County Sheriff's Deputy stood by the door observing the interaction.

50.     Principal Duran opened the meeting by saying that she assumed Moyer was there because of the "incident" with the Snapchat post.

51.     Then, without any prior notice or opportunity to respond, Principal Duran and Assistant Principal Larson immediately announced that Plaintiff was being suspended for five days as a result of the post.

52.     When Moyer asked why this decision had been made to suspend Plaintiff, Principal Duran said, "When we see pictures of a 17-year-old holding an assault rifle, it sends panic through our building."

53.     At the same time, Principal Duran and Assistant Principal Larson both agreed that Plaintiff had not threatened anybody in the Snapchat Post or otherwise.

54.     Moyer continued taking issue with this action, but neither Principal Duran nor Assistant Principal Larson could identify a specific school policy that Plaintiff had allegedly violated in publishing the Snapchat Post. Principal Duran simply said Plaintiff was being suspended because she was holding a gun in the post.

55.     Moyer replied it was very clear from the caption of the post itself that Plaintiff was simply going to a shooting range. In response, Principal Duran stated only that it did not matter. Neither she nor Assistant Principal Larson cited anything other than the post as the basis for the suspension imposed.

56.     Later that same day, Principal Duran emailed Moyer a "follow-up" letter. A true and correct copy of that letter (hereinafter, the "Oct. 11 Letter") is attached hereto as Exhibit B.

57.     In the Oct. 11 Letter, Principal Duran identified the purported basis for Plaintiff's suspension as "detrimental behavior" within the meaning of CCSD Policy No. JKD-1-E ("Grounds for Suspension, Expulsion or Denial of Admission"), CCSD Policy No. JICDA ("Conduct and Discipline Code"), and C.R.S. § 22-33-106. The letter then specifically quoted the language of CCSD Policy JICDA as follows:

> *"Behavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel."*

True and correct copies of CCSD Policy Nos. JICDA and JKD-1-E (eff. July 1, 2019) are attached hereto as Exhibit C. The letter warned Plaintiff that during the suspension period she was "not to be on school grounds in any building, or in attendance of any school activity of the Cherry Creek School District," and that "[v]iolation of this rule could result in her arrest for trespassing." Ex. B.

58.     The Oct. 11 Letter failed to explain *how or why* Plaintiff's Snapchat Post—or, for that matter, any other speech or conduct by Plaintiff—was purportedly detrimental to the "welfare, safety, or morals" of Endeavor students or staff. Indeed, neither Principal Duran nor other school officials have ever provided Plaintiff or her family with any such explanation.

59.     The Oct. 11 Letter also did not assert that the Snapchat Post had somehow resulted in a substantial disruption to Endeavor school activities. Nor did the letter claim to forecast any such substantial disruption.

60.     Notably, the Oct. 11 Letter also threatened additional punishment against Plaintiff for further exercise of her freedom of speech. Specifically, the letter stated, "[A]ny further incidents *will* result in additional consequences being taken by Endeavor Academy." Oct. 11 Letter., Ex. B (emphasis added).

61.      The letter provided no opportunity for a hearing and offered no alternative for Plaintiff to continue attending school during the suspension period while accompanied by a parent or legal guardian.

62.     Plaintiff served the first day of the five-day suspension on October 11, 2019, and the others on October 21 through October 24, 2019.

63.     Upon Plaintiff's return to school, she was segregated during recreational time for a period of approximately three hours in the afternoon, wherein she was placed in a room unsupervised and required to remain in the room until the school day was over. This segregation was purportedly for Plaintiff's safety, in response to threats made against her, but on information and belief, no student threatening her was disciplined as harshly as Plaintiff was for her non-threatening off-campus speech. Further, Plaintiff's *unsupervised* segregation was a useless security measure, having only a punitive, rather than protective, effect.

## CLAIMS FOR RELIEF

### First Claim for Relief

(Violation of 42 U.S.C. § 1983—Infringement on Freedom of Speech under the First and Fourteenth Amendments)

64.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

65.     The First Amendment to the United States Constitution provides "Congress shall make no law…abridging the freedom of speech."

66.     For half a century, it has been the "unmistakable holding" of the Supreme Court that students do not "shed their constitutional rights to freedom of speech or expression at the school house gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969). Instead, "student expression may not be suppressed unless school officials reasonably conclude" that the expression "will materially and substantially disrupt the work and discipline of the school." *Morse v. Frederick*, 551 U.S. 393, 405 (2007) (citing *Tinker* at 513). Of special relevance here, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" in public schools. *Tinker* at 509.

67.     Defendants had nothing but an "undifferentiated fear" as their basis for restricting Plaintiff's freedom of expression. The Oct. 11 Letter did not explain how or why the Snapchat Post was purportedly "detrimental," let alone attempt to articulate whether or why Defendants believed that the Snapchat Post had caused a "substantial disruption" or could be forecast to create a "substantial disruption"

with Endeavor's school activities. See *Tinker*, 393 U.S. at 514. Instead, Defendants' analysis—or lack thereof—can be gleaned solely from Principal Duran's remarks to Plaintiff and her family on the morning of October 11, 2019, by which point Defendants had already made their decision to suspend Plaintiff for five days.

68.     There was in fact nothing illegal, dangerous, or injurious to the welfare or safety of any pupils or school personnel in this Snapchat Post espousing classically protected political speech created after school hours, off campus, and on an open media platform not directed at anyone or anything related to the school. In short, there was and is no constitutional basis for Defendants to punish and restrict Plaintiff's speech, which occurred entirely outside "the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. at 506.

69.     Defendants, acting under color of state law, have acted to deprive Plaintiff of rights guaranteed by the First Amendment, as incorporated against the States by the Fourteenth Amendment, to the United States Constitution.

70.     It is evident that Principal Duran was exercising authority delegated to her by the School Board pursuant to C.R.S. § 22-33-106(2)(b), and acting under the supervision of Superintendent Siegfried pursuant to C.R.S. § 22-32-126, to impose disciplinary suspension against students for behavior "detrimental to the welfare or safety of other pupils or of school personnel" pursuant to the policies adopted by the School Board and implemented by CCSD at Endeavor.

71.     As a direct and proximate result of Defendants' violation of the First and Fourteenth Amendments, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, the chilling of future protected expression, loss of five instructional days of schooling, and further retaliatory and punitive conduct by school authorities. Plaintiff has endured and will continue to endure personal humiliation, mental anguish and suffering, and damage to her reputation on account of this deprivation of her fundamental rights.

72.     Defendants' deprivation of Plaintiff's First and Fourteenth Amendment rights, and the retaliatory suspension and isolation from her normal school duties, constitute a malicious, wanton and callous indifference for her constitutionally protected rights.

73.      Plaintiff is entitled to redress for this deprivation of rights in the form of the relief requested herein.

## **Second Claim for Relief**

(Violation of 42 U.S.C. § 1983—Void for Vagueness and Denial of Due Process under the Fifth and Fourteenth Amendments)

74.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

75.     CCSD Policy JKD-1-E and C.R.S. § 22-33-106(1)(c), the state statute that the policy mirrors, are unconstitutionally void for vagueness under the First and Fourteenth Amendments, facially and as-applied, in their proscription of "[b]ehavior on or off school property which is detrimental to the welfare or safety of

other pupils or of school personnel." CCSD Policy JICDA is similarly

unconstitutional to the extent it overlaps with, purports to expand, and otherwise

conflicts with CCSD Policy JKD-1-E in its proscription of "[b]ehavior on or off school

property that is detrimental to the welfare, safety, *or morals* of other students or

school personnel."

76. "Vague laws contravene the 'first essential of due process of law' that

statutes must give people 'of common intelligence' fair notice of what the law

demands of them." *United States v. Davis*, 139 S.Ct. 2319, 2325 (2019) (quoting

*Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). A law is

unconstitutionally vague "'if it fails to provide people of ordinary intelligence a

reasonable opportunity to understand what conduct it prohibits,'" or "'it authorizes

or even encourages arbitrary and discriminatory enforcement.'" *United States v.

Rodebaugh*, 798 F.3d 1291, 1295 (10th Cir. 2015) (quoting *Hill v. Colorado*, 530 U.S.

703, 732 (2000)).

77. A law is facially void for vagueness when it is "vague in the vast

majority of its applications; that is, that 'vagueness permeates the text of [the]

law.'" *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006)

(quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).

78. CCSD Policy JKD-1-E and C.R.S. § 22-33-106(1)(c) render students

subject to disciplinary suspension actions for engaging in "[b]ehavior on or off school

property that is detrimental to the welfare or safety of other pupils or of school

personnel." This language provides no definition, clarification, or clear guidance as to what kind of behavior falls within its purview as implicating the "welfare or safety" of pupils or school personnel, under what circumstances a given behavior would be "detrimental" to such "welfare or safety," or by what legal, social, or moral standards this determination is to be made.

79.     The trouble with CCSD Policy JKD-1-E and C.R.S. § 22-33-106(1)(c) is significantly compounded by CCSD Policy JICDA. CCSD Policy JICDA is confusingly written to *also* apply to all student "behavior on or off school property" whenever that behavior occurs on school grounds or during a school-related activity. Thus, according to their language, *both* CCSD Policy JKD-1-E *and* CCSD Policy JICDA apply to student behavior "on or off school property," with the former applying to *all* offending conduct on or off school property and the latter applying to the subset of offending conduct that occurs on school grounds or during school-related activities. In other words, the scope of behavior targeted by CCSD Policy JICDA is *subsumed within* the scope of behavior targeted by CCSD Policy JKD-1-E (and C.R.S. § 22-33-106(1)(c), which it mirrors). This sets up an untenable situation from a due process perspective: CCSD Policy JICDA proscribes a wider scope of student behavior in purporting to regulate all "[b]ehavior on or off school property that is detrimental to the welfare, safety*, or morals* of other students or school personnel," whereas CCSD Policy JKD-1-E and C.R.S. § 22-33-106(1)(c) target only behavior "detrimental to the welfare or safety" of other students or school personnel.

21

80.     Consequently, *two* distinct standards apply to all student behavior that occurs on school grounds or during any school-related activity: under one standard, a student is subject to punishment for behavior detrimental to "welfare or safety," and under the other, the same student is subject to punishment for behavior detrimental to "welfare, safety, or morals." And because *both* are written to apply in the same context, *either* one could be applied in any given scenario, leaving students at the mercy of arbitrary determinations of not only what constitutes behavior "detrimental" to "welfare or safety," or "welfare, safety, or morals," but whimsical decisions as to which of these distinct standards will govern their behavior.

81.     "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *United States v. Rodebaugh*, 798 F.3d at 1294–95 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108). The nebulous and conflicting language within the two distinct sets of vague standards established under CCSD Policy JKD-1-E and CCSD Policy JICDA leaves school officials like Defendants with unbridled discretion to impose suspensions arbitrarily and capriciously based on whatever may strike the individual official as "detrimental" to "welfare or safety," or "welfare, safety, *or morals*," in the given moment. *Beckles v. United States*, 137 S.Ct. 886, 894 (2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)) ("Laws that 'regulate persons or entities,' we have explained, must be sufficiently clear 'that those enforcing the law do not act in an arbitrary or discriminatory way.'").

22

82.     Even if the CCSD policies and C.R.S. § 22-33-106(1)(c) are not facially unconstitutional, they are void for vagueness *as-applied* here. *Assuming* this amorphous, conflicting language could be applied constitutionally in some other hypothetical scenario, it could not be constitutionally applied here, because Plaintiff simply "could not reasonably understand that h[er] contemplated conduct is proscribed" under this language. *United States v. Rodebaugh*, 798 F.3d at 1295. In fact, Defendants' Oct. 11 Letter notifying Plaintiff of the basis for the suspension (only *after* the fact) highlights the serious trouble with the vague and conflicting standards involved. Defendants cited *both* the standard under CCSD Policy JKD-1-E / C.R.S. § 22-33-106(1)(c) *and* CCSD Policy JICDA, and they appeared to ultimately rest the basis on CCSD Policy JICDA. Ex. B. By its own terms, CCSD Policy JICDA applies only to behavior that occurs on school grounds or during school-related activities, which Plaintiff's did not. That Defendants would invoke this standard nonetheless as somehow a separately applicable or related basis for the suspension poignantly illustrates the due process dangers in action.

83.     By enforcing against Plaintiff unconstitutionally vague policies and laws, Defendants, acting under color of state law, have deprived Plaintiff of her rights guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution. This is particularly true given that Plaintiff's conduct involved the exercise of classically protected free speech rights – as she herself specifically

emphasized in describing the intent of the Snapchat post as "*using the first ammendment* [sic] to practice our second amendment."

84.     As a direct and proximate result of Defendants' violation of Plaintiff's rights under the Fifth and Fourteenth Amendments, she has suffered irreparable harm and is entitled to redress for this deprivation of rights in the form of the relief requested herein.

## Third Claim for Relief

(Violation of 42 U.S.C. § 1983—Overbreadth and Denial of Due Process under the First, Fifth, and Fourteenth Amendments)

85.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

86.     Whether or not CCSD Policies JKD-1-E and JICDA, and C.R.S. § 22-33-106(1)(c), are unconstitutionally void for vagueness, they are unconstitutionally overbroad, which constitutes a separate and independent violation of Plaintiff's rights under the First, Fifth, and Fourteenth Amendments.

87.     "[T]he overbreadth doctrine enables litigants to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Colorado v. Hill*, 530 U.S. 703, 731-32. Such laws go substantially beyond a "legitimate sweep" to capture many forms of protected speech. *Id.* at 732.

88.     The inherently amorphous and conflicting nature of the language in CCSD Policies JKD-1-E and JICDA, and C.R.S. § 22-33-106(1)(c), which permits arbitrary and capricious impositions of disciplinary suspension based on whimsical determinations that a particular behavior is "detrimental" to "the welfare or safety," or "the welfare, safety, or morals," of other pupils or of school personnel depending upon which standard the school elects to apply within its apparently unchecked discretion to choose between two, necessarily produces a standardless measure that could capture all sorts of protected speech well beyond any "legitimate sweep." Surely, there is a substantial likelihood that the "very existence" of such unbridled discretion in imposing disciplinary suspensions "*may* cause" other students "to refrain from constitutionally protected speech or expression."

89.     By enforcing against Plaintiff unconstitutionally overbroad policies and laws, Defendants, acting under color of state law, have deprived Plaintiff of her rights guaranteed under the First, Fifth, and Fourteenth Amendments to the United States Constitution.

90.     As a direct and proximate result of Defendants' violation of Plaintiff's rights under the First, Fifth, and Fourteenth Amendments, she has suffered irreparable harm and is entitled to redress for this deprivation of rights in the form of the relief requested herein.

**Fourth Claim for Relief**

(Violation of 42 U.S.C. § 1983—Denial of Procedural Due Process under the Fifth
and Fourteenth Amendments)

91.     Plaintiff hereby incorporates by reference the allegations set forth

above as though fully set forth herein.

92.     While Plaintiff strenuously maintains that the disciplinary action at

issue violated her constitutional rights as set forth in the above claims for relief, she

was regardless entitled to adequate due process before the action was taken, and

the failure to afford such process constitutes a separate actionable claim for relief.

93.     "Students facing temporary suspension have interests qualifying for

protection of the Due Process Clause [of the Fourteenth Amendment], and due

process requires, in connection with a suspension of 10 days or less, that the

student be given oral or written notice of the charges against him and, if he denies

them, an explanation of the evidence the authorities have and an opportunity to

present his side of the story." *Flores v. Victory Preparatory Academy*, 411 F.Supp.3d

1149, 1161-62 (D. Colo. 2019) (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975); *see

also* C.R.S. § 22-33-105(c) (mandating such students "receive an informal hearing by

the school principal or the principal's designee prior to the pupil's removal from

school, unless an emergency requires immediate removal from school").

94.     Here, Defendants afforded Plaintiff no notice or process at all before

imposing their disciplinary suspension action against her. At the very start of the

meeting in Principal Duran's office the day after the Snapchat post – the *one and*

26

*only* "hearing" opportunity Plaintiff was ever afforded – Principal Duran and

Assistant Principal Larson immediately announced the *pre-determined* conclusion

that Plaintiff would be suspended. At no time during this meeting did either of

them ever identify the actual basis for the disciplinary action, as they were unable

or willing to state the school policy or law that Plaintiff had allegedly violated. So,

Plaintiff clearly was not "given oral or written notice of *the charges* against h[er]"

before the disciplinary action was imposed and, without knowing the basis of the

decision, she clearly had no meaningful opportunity to meet the accusations.

    95.    When Defendants finally did identify the nature of the actual charges

against her – citing the distinct standards of *both* CCSD Policy JKD-1-E / C.R.S. §

22-33-106(c) *and* CCSD JICDA as the basis for the suspension – it was later in the

day, *after* she had been sent home to start serving her suspension, through a letter

sent by email and separately by mail. The letter offered no opportunity for Plaintiff

to respond with any arguments or evidence as to why these charges were unfounded

or unsubstantiated. Indeed, it is difficult to see how Plaintiff *could have*

meaningfully met these charges even if she had been given an opportunity to do so,

given that Defendants relied upon *two distinctly different* – not to mention

hopelessly vague – standards as the basis for the suspension action. Defendants

also never notified Plaintiff, much less extended her an opportunity to take

advantage, of any school policy under which, as "an alternative to suspension," she

could have "remain[ed] in school" while accompanied by a parent or legal guardian

during the suspension period. Thus, Defendants either had no such policy in place or refused to consider such an alternative in her case, contravening the state statutory scheme designed to ensure a fair process. *See* C.R.S. § 22-33-105(d)(4).

96.     Accordingly, Plaintiff was denied her fundamental due process rights to prior notice of and an opportunity to meet the charges against her before Defendants imposed the disciplinary suspension. Defendants' action is of particular concern because it involved the exercise of speech on matters of public interest. Again, however, even assuming for the sake of argument that the action itself was otherwise constitutional, the imposition of the disciplinary suspension without the due process to which Plaintiff was entitled is independently actionable as a violation of her rights under the Fifth and Fourteenth Amendments.

97.     As a direct and proximate result of Defendants' violation of the Fifth and Fourteenth Amendments, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, the chilling of future protected expression, loss of five instructional days of schooling, and further retaliatory and punitive conduct by school authorities, entitling her to the relief requested herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, finding and stating as follows:

(a)     Defendants have violated Plaintiff's free speech rights under the First and Fourteenth Amendments to the United States Constitution.

(b)     CCDS Policies JKD-1-E and JICDA, and C.R.S. § 22-33-106(1)(c), are unconstitutionally vague on their face and as applied to Plaintiff, pursuant to the First, Fifth, and Fourteenth Amendments to the United States Constitution.

(c)     CCDS Policies JKD-1-E and JICDA, and C.R.S. § 22-33-106(1)(c), are unconstitutionally overbroad under the First, Fifth, and Fourteenth Amendments to the United States Constitution.

(d)     Plaintiff was denied her right to procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution.

(e)     Defendants are enjoined from enforcing these policies, practices, and customs inconsistent with the First, Fifth, and Fourteenth Amendments, and are prohibited from taken further disciplinary actions against Plaintiff based on any future protected speech activities relating to firearms.

(f)     Defendants are prohibited from releasing to any third parties records which indicate Plaintiff was suspended for violating CCDS Policy JKD-1-E, CCSD Policy JICDA, and/or C.R.S. § 22-33-106(1)(c).

(g)     Defendants are ordered to rescind and expunge from Plaintiff's school records all disciplinary action taken against her as a result of her constitutionally protected speech, including the suspension at issue in this case.

(h)     Plaintiff requests an award of nominal damages against Defendants, pursuant to 42 U.S.C. § 1983 and any other applicable law, for violating her constitutional rights.

(i)    Plaintiff requests an award of compensatory damages, pursuant to 42 U.S.C. § 1983 and any other applicable law, for violating her constitutional rights.

(j)    Plaintiff requests an award of punitive damages against Defendants pursuant to 42 U.S.C. § 1983 and any other applicable law, for violating her constitutional rights.

(k)    Plaintiff requests costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988 and any other applicable law.

(l)    Plaintiff requests such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial.


Dated this 6th day of March, 2020.

Respectfully Submitted,

/s/ Adam Kraut
Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org


/s/ Joseph Greenlee
Joseph Greenlee, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814

P: (916) 378-5785
E: jgreenlee@fpclaw.org

*Attorneys for Plaintiff*