**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **A.K.,** a minor, by and through **KELLEY MOYER**, Plaintiff | Civil Action No. 1:20-cv-00392 |
| v. | |
| **CHERRY CREEK SCHOOL DISTRICT NO. 5,** *et al.***,** Defendants | |

**Plaintiff's Motion and Supporting Memorandum of Points for Temporary Restraining Order and Preliminary Injunction**

Minor plaintiff A.K., by and through her counsel and her next friend Kelly Moyer ("Moyer"), hereby moves for a temporary restraining order and a preliminary injunction against the Cherry Creek School District defendants ("CCSD"). She asks that this Court order CCSD to remove any disciplinary notations associated with her Oct. 10, 2019 post; not take any disciplinary measures should she post similar nonthreatening, constitutionally protected speech; and not enforce CCSD's unconstitutionally overbroad and vague policies (JKD-1-E and JICDA) or C.R.S. § 22-33-106(1)(c) against her future speech.

Defendants have been contacted, pursuant to the parties' duty to confer (D.C.COLO.LCivR 7.1(a)), and have indicated they would not acquiesce to the requested relief.

### I. INTRODUCTION

Defendants have punished A.K.—a high school student at CCSD's Endeavor Academy—for her constitutionally protected speech:

> [M]e and my legal guardian are going to the gun range to practice gun *safety* and *responsible* gun ownership while getting better so we can protect ourselves while also using the *first amendment* to practice our *second ammendment* [sic].

1

See Exhibit A (italics added). This speech was posted from her own home, after school hours, on a social media platform (Snapchat). It was not about or directed toward any Endeavor Academy students, faculty, or staff. It was not intended to be and could not reasonably be interpreted as threatening or harmful to anyone within the school system or elsewhere. Yet, it was restricted and penalized under policies that were unconstitutionally overbroad on their face and unconstitutionally vague, as well as being unconstitutional as applied.

The only thing to which Defendants can point in attempting to justify their targeting of this classically protected political free speech is the fact that A.K.'s message was accompanied by a photograph of her and her adult brother each wearing scarves and holding a firearm—certainly not surprising at all, much less threatening, given the content of the message—and "flipping the bird" at the camera. Yet nothing in this image may reasonably be construed as somehow transforming this otherwise entirely protected, non-threatening speech about gun safety and responsibility into anything remotely subject to censorship, much less discipline. Until Defendants are enjoined by this Court from enforcing their unconstitutional policies and practices against her, A.K. remains at their mercy, effectively restrained from exercising her free speech rights.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). It is even more clear that they do not lose their free speech rights when they speak far outside the schoolhouse gate, long after school hours, and on entirely personal matters, as A.K. did here.

## II.  STATEMENT OF FACTS

On Oct. 10, 2019, A.K. was at home getting ready to go to Centennial Gun Club with her older brother, an Army veteran, for target practice. Decl. of A.K. at ¶12; Decl. Kelley Moyer at ¶2; Decl.

2

of Jeff Moyer at ¶2; Decl. of Chad Johnson at ¶2. Before leaving for the range, A.K. and her brother posed for a picture that she posted on her Snapchat account. The image depicted Plaintiff and her brother wearing headscarves, holding firearms, and "flipping off" the camera, and it was captioned with the following message:

> me and my legal guardian are going to the gun range to practice gun safety and responsible gun ownership while getting better so we can protect ourselves while also using the first amendment to practice our second ammendment [sic].

Exhibit A; Decl. of A.K. Decl. at ¶13; K. Moyer Decl. at ¶3; J. Moyer Decl. at ¶3; C. Johnson Decl. at ¶3.

The message emphasized gun safety and responsibility, and A.K.'s support for her constitutional rights. Nevertheless, someone reported the image to the Aurora Police Department and, in response, police officers visited A.K.'s father, Chad Johnson, to inquire about the post. K. Moyer Decl. at ¶5; J. Moyer Decl. at ¶4; C. Johnson Decl. at ¶¶4-10. Ultimately, the Police Department apologized to Mr. Johnson for having bothered him at all about the situation, explaining that they saw nothing threatening about the post. K. Moyer Decl. at ¶6; C. Johnson Decl. at ¶10.

The following morning, Mrs. Moyer and her husband, A.K.'s stepfather, Jeff Moyer, accompanied A.K. to Endeavor Academy, because they were concerned that the police had visited Mr. Johnson. A.K. Decl. at ¶16; K. Moyer Decl. at ¶7; J. Moyer Decl. at ¶5. Upon arriving, the three were met by security officers who escorted them to Principal Duran's office, where both she and Assistant Principal Larson were waiting for them. A.K. Decl. at ¶17; K. Moyer Decl. at ¶8; J. Moyer Decl. at ¶6. A security officer remained outside the door during the meeting. A.K. Decl. at ¶17; K. Moyer Decl. at ¶9; J. Moyer Decl.at ¶8.

3

Duran began the meeting by saying she assumed Mr. and Mrs. Moyer were there because of the Snapchat photo. K. Moyer Decl. at ¶10. Then, without any notice or opportunity to respond, Duran announced that A.K. had been suspended for five days. A.K. Decl. at ¶18; K. Moyer Decl. at ¶10; J. Moyer Decl. at ¶11. When Moyer inquired as to the basis for the suspension, Duran said, "When we see pictures of a 17-year-old holding an assault rifle, it sends panic through our building." A.K. Decl. at ¶18; K. Moyer Decl. at ¶11; J. Moyer Decl. at ¶10. A.K. was thus suspended merely because the post depicted her holding a gun.

Duran and Larson conceded that A.K. had not threatened anyone in the Snapchat post or at any other time. A.K. Decl. at ¶19; K. Moyer Decl. at ¶12; J. Moyer Decl. at ¶12. Neither Duran nor Larson was able to articulate a specific policy that A.K. had allegedly violated. K. Moyer Decl. at ¶13. The entire discussion centered on the Snapchat post depicting A.K. and her brother holding firearms; neither Duran nor Larson mentioned any other post or conduct as forming the basis of the disciplinary action. A.K. Decl. at ¶20; K. Moyer Decl. at ¶16; J. Moyer Decl. at ¶13.

The first time that Defendants cited any particular basis for this suspension was in a letter Principal Duran emailed Mrs. Moyer later that day, a copy of which is attached as Exhibit B. In this letter, Duran asserted that A.K.'s speech had violated CCSD Policy Nos. JKD-1-E and JICDA, as well as C.R.S. § 22-33-106(1)(c), concerning "detrimental behavior" by public school students. Specifically, Duran's letter stated that the basis for the suspension was, "*Behavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel*," Exhibit B, without providing any explanation for how A.K.'s post allegedly harmed anyone's welfare, safety, or morals. And Duran's letter threatened that "[a]ny further incidents *will* result in additional consequences being taken by Endeavor Academy." Exhibit B (italics added).

4

Since that time, due to the COVID-19 pandemic, the public schools, including CCSD, have suspended in-person classes and school activities, and they are now conducting school through online and remote platforms. K. Moyer Decl. ¶¶26-27. This will continue throughout the remainder of the 2019-2020 school year. *Id*. at ¶27. However, all CCSD students, including A.K., remain under the authority and control of Defendants and subject to discipline for further speech that is allegedly detrimental to "welfare," "safety," or "morals," just as A.K. was disciplined for her speech.

### III. ARGUMENT

"To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that [the movant is] 'substantially likely to succeed on the merits,' (2) that [the movant will] 'suffer irreparable injury' if the court denies the injunction, (3) that [the movant's] 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't 'adverse to the public interest.'" *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (citation omitted). When the second, third, and fourth factors (irreparable injury, balance of the harms, and the public interest) "tip strongly" in the movant's favor, a preliminary injunction is proper even when the moving party's likelihood of success on the merits may be debatable. *Verlo v. Martinez*, 820 F.3d 1113, 1128 n.5 (10th Cir. 2016). The standard for the issuance of a temporary restraining order is the same as a preliminary injunction, though the movant must also "demonstrate clearly, with specific factual allegations, that immediate and irreparable injury will result absent a temporary restraining order." *New Pro Publications v. Links Media Grp., L.L.C.*, No. 07-CV-02230-R, 2007 WL 3226164, at *2 (D. Colo. Oct. 26, 2007).

### A. A.K. is Likely to Succeed on the Merits

#### 1. Defendants' Targeting of A.K.'s Classically Protected Political Speech is Subject to Strict Scrutiny

The principal clearly restricted A.K.'s speech because of its content: because of what it said and depicted, and because of the supposed harm flowing from this message. Yet content-based speech restrictions—"those that target speech based on its communicative content"—"are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Any government restriction that draws "distinctions based on the message a speaker conveys," whether targeting the speech "on its face" or "by its function or purpose," is subject to strict scrutiny. *Id.* at 2227. Indeed, even a "generally applicable" rule is subject to strict scrutiny when it was "directed at [a speaker] because of what his speech communicated," which is to say when he violated the rule "because of the . . . content of his particular message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). And speech on social media is equally protected under the First Amendment. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

Here, Defendants cannot show that the restriction of A.K.'s speech furthers a compelling interest nor that it is narrowly tailored to achieve that interest. A.K.'s speech was not threatening, libelous, or even personally insulting to any CCSD students, faculty, or staff. Quite to the contrary, the message clearly and emphatically promoted gun safety, responsibility, and the lawful exercise of constitutionally protected rights.

#### 2. The Result Is the Same Under *Tinker*

In *Tinker*, the Supreme Court held that schools may regulate in-school student speech that "materially and substantially interfere with the requirements of appropriate discipline in the

6

operation of the school" or that intrudes upon "the rights of other students." 393 U.S. at 508, 513. Since *Tinker*, the Supreme Court has identified three further categories of restrictable student speech: lewd, vulgar, or indecent speech at school, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), school-sponsored speech, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), and nonpolitical speech "promoting illegal drug usage" "at a school-sanctioned and school-supervised event," *Morse v. Frederick*, 551 U.S. 393, 398 (2007). None of these categories embraces off-campus student speech disseminated on the internet and wholly unrelated to a school-sponsored activity.

In *Tinker*, the Court stressed that, "[i]t can hardly be argued that . . . students . . . shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. It is even more clear that students do not lose their free speech rights far outside the schoolhouse gate—indeed, in their own homes. Whatever extra power schools may have over student speech in school, they cannot have round-the-clock power over the entirety of their students' lives. "[A] student's free speech rights outside the school context are coextensive with the rights of an adult." *J.S. ex rel. Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 932 (3rd Cir. 2011) (en banc).

Thus, for instance, in *J.S.*, the en banc Third Circuit recognized students' broad rights to engage in off-campus speech, even as to speech that (unlike the speech in this case) was sharply critical of a fellow member of the school community. Eighth-grade student J.S. had created a MySpace page mocking her school principal (referencing him by his picture) using lewd language and sexually explicit material. *Id* at 920. She had created the page without using school equipment and outside school hours, but was nonetheless suspended from school for ten days based on her speech. *Id.*

7

The Third Circuit held that the suspension violated the First Amendment and could not be justified under the rationale of either *Fraser* or *Tinker*. The speech, though lewd and offensive, occurred completely off-campus and thus outside of the sphere of influence of the school. *J.S.*, 650 F.3d at 932. And the speech did not support a "reasonable forecast that a substantial disruption or material interference [in the school]—and not just offense —"will occur," *id.* at 929-30, 933.

Similarly, in *B.L. v. Mahanoy Area Sch. Dist.*, 376 F. Supp. 3d 429 (M.D. Pa. 2019), the district court held that a school could not suspend a student (even merely from a cheer team) for her online off-campus Snapchat speech, even when it was lewd and vulgar. The court quickly dismissed the school's argument under *Fraser,* reasoning that off-campus speech does not fall within the governing reach of the school merely because it is profane. *Id.* at 441. The court also rejected any potential defense under *Tinker*, finding that concerns over disrupting a broadly defined "educational mission," as the school attempted to claim, could not support regulating off-campus vulgarity. *Id*. at 442. The court determined that B.L.'s speech, much like J.S.'s speech, did not create any disorder, and nor was it reasonable to fear any future disorder or disruption from the speech. *Id*. at 443-44.

The same is true in this case. A.K.'s speech occurred completely off school grounds and did not create any likelihood of substantial disruption to or material interference with the school. Indeed, the speech made no reference to the school or anyone associated with it. If speech like J.S.'s, which directly targets a school principal with a lewd and offensive message, does not reasonably risk causing future disruption, then the nonvulgar political speech in this case (which does not reference the school in any way) could not do so, either.

Threats of violence, of course, are constitutionally unprotected, *see Virginia v. Black*, 538 U.S. 343 (2003); and other forms of threatening speech falling short of a crime might legitimately subject a student to punishment. *See, e.g., D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766 (8th Cir. 2011) (it was "reasonably foreseeable that D.J.M.'s threats about shooting specific students in school would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment"); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 36; 40 (2d Cir. 2007) (finding that a drawing of a pistol firing a bullet at a person's head, with the words "Kill Mr. VanderMolen[]" (who was an English Teacher), "once made known to the teacher and other school officials, would foreseeably create a risk of substantial disruption within the school environment"). But no such threats were present here; and the mere picture of a gun, in the context of a reference to safe and lawful firearm use—coupled with the Second Amendment—cannot be viewed or treated as a punishable threat. *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) (discussed *infra*). The punishment of A.K.'s speech is thus unconstitutional, and the threat of punishment for future speech ("[a]ny further incidents will result in additional consequences being taken by Endeavor Academy," Exhibit B) is an unconstitutional prior restraint, *see Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1209 (10th Cir. 2007) ("[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens.").

### 3. Defendants' Policies are Unconstitutionally Overbroad

Principal Duran's letter explaining why A.K. had been suspended cited CCSD Policy JKD-1-E ("Grounds for Suspension, Expulsion or Denial of Admission"), CCSD Policy JICDA ("Conduct and Discipline Code"), and C.R.S. § 22-33-106. Policy JKD-1-E essentially mirrors C.R.S. § 22-

9

33-106(1)(c) in rendering students subject to disciplinary suspension for engaging in "[b]ehavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel." The JICDA policy also bans "Behavior on or off school property that is detrimental to the welfare, safety, *or morals* of other students or school personnel," JICDA ¶ 19 (emphasis added); and while that appears to be on its face limited to "activities while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity," Principal Duran's letter treats JICDA as applying to non-school-sponsored speech posted from home as well.

As applied to speech, these policies are unconstitutionally overbroad. "[T]he overbreadth doctrine enables litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Colorado v. Hill*, 530 U.S. 703, 731-32 (citations omitted). Such laws go substantially beyond a "legitimate sweep" to capture many forms of protected speech. *Id.* at 732. And this principle applies to overbroad government agency policies as well. *See, e.g.*, *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, 1234 (D. Kan. 1998) (evaluating a school policy for overbreadth, and concluding that it "would likely be overbroad" had it not been narrowed by school administrators' practices), *aff'd*, 206 F.3d 1358 (10th Cir. 2000).

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003), is closely analogous to this case. In *Newsom*, the Fourth Circuit struck down as unconstitutionally overbroad a school policy that banned clothing with "messages . . . that relate to . . . weapons." *Id.* at 255. The policy, the court noted, could reach even "lawful, nonviolent, and nonthreatening symbols of not only popular, but important organizations and ideals." *Id*. at 259-60. Given this, "and in the

10

absence of any cogent limiting construction of the [policy]" (such as a limitation to disruptive on-campus speech, *id.* at 260 n.8), the court held that the plaintiff had "demonstrated a strong likelihood of success on the merits on his overbreadth claim," *id.* at 260. This was so even when the policy was apparently limited to speech at school, *Id.* at 259-60. The CCSD policies are even more clearly overbroad since they cover speech at home.

Likewise, in *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001), the Third Circuit (in an opinion by then-Judge Alito) struck down a school district's anti-harassment policy, even though that policy was focused on in-school speech. Because the policy "reache[d] any speech that interferes or is intended to interfere with educational performance or that creates or is intended to create a hostile environment," the court concluded that the policy was "substantially overbroad." *Id.* at 216. The policy on its face was not limited to speech that was vulgar, disruptive, or school-sponsored, and the policy thus unconstitutionally "cover[ed] substantially more speech than could be prohibited under *Tinker*'s substantial disruption test." *Id.* at 217.

Here, CCSD's policies likewise extend far beyond the limited speech restrictions upheld in *Tinker*, *Fraser*, *Hazelwood*, and *Morse*. Those policies punish substantial amounts of nondisruptive, nonvulgar speech far outside school-sponsored activities—and indeed outside school itself—any time the speech is "detrimental to the welfare, safety, or morals of other students or school personnel" in the unbridled judgment of any school official. This is an even broader range of speech than that forbidden by the overbroad harassment ban in *Saxe*. And of course even "immoral" ideas are fully constitutionally protected, even against the denial of a modest benefit (trademark registration), *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). They are

likewise protected against the threat of suspension or expulsion from school, especially when they are conveyed from the student's own home rather than at school.

### 4. The Policies Invoked to Suspend A.K. Are Unconstitutionally Vague

The JICDA policy, the JKD-E-1 policy, and C.R.S. § 22-33-106(1)(c) also provide no clear definition or guidance as to what kind of speech is "detrimental" to "welfare," "safety," or "morals," and are thus unconstitutionally vague.

"A vague regulation," including a vague school policy, "is constitutionally infirm in two significant respects." *Stephenson v. Davenport Comm. School Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). First, "a regulation 'violates the first essential of due process of law' by failing to provide adequate notice of prohibited conduct" to people "'of common intelligence.'" *Id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Second, "the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement." *Id.* (citing *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). "'A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.'" *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). And, as the *Stephenson* court recognized, this is impermissible when the delegation is to principals as well as police officers. *See also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 50 (10th Cir. 2013) (likewise applying void-for-vagueness analysis to a school policy).

CCSD's JICDA and JKD-1-E policies, and C.R.S. § 22-33-106(1)(c) (which JKD-1-E mirrors) all fail to afford people of "common intelligence," let alone high school students, a reasonable opportunity to understand what speech is permitted and what speech is punishable as "detrimental" to "welfare or safety" or "welfare, safety, or morals." Indeed, the JICDA policy by its express

terms applies only to conduct "on school grounds, in school vehicles, or during a school-sponsored activity," and yet Defendants cited that policy as one of the bases of the discipline against A.K., when her speech clearly did *not* occur in any such setting. *See supra* p. 9. What is a high school student of common intelligence to make of that?

In *Stephenson*, the court struck down as unconstitutionally vague a school ban on "gang symbols." It noted that they "take many forms and are constantly changing"; "[a]ccordingly, the District must 'define with some care' the 'gang related activities' it wishes students to avoid. The regulation, however, fails to define the term at all and, consequently, fails to provide meaningful guidance for those who enforce it." 110 F.3d at 1310. The same applies here: people's judgment about what speech harms "welfare, safety, or morals" is constantly changing, indeed from person to person. To punish such speech, the District must "define with some care" what speech supposedly jeopardizing welfare, safety, or morals "it wishes students to avoid." But the policies here "fail[] to define the term[s] at all and, consequently, fail[] to provide meaningful guidance for those who enforce [them]."

### B. Immediate Relief is Necessary to Prevent Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury . . . . What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill." *Free the Nipple-Fort Collins*, 916 F.3d at 805-06.

Here, defendants have expressly threatened to suspend A.K. if she should engage in similar speech. And given that the speech for which she was already punished occurred entirely off-campus, after school hours, and through a platform totally unrelated to any school activity, the threat of continuing harm remains just as real even though CCSD has moved to online instruction.

Plaintiff is also informed that Defendants are maintaining records documenting that they suspended A.K. for her supposed violation of school policies. K. Moyer Decl. at ¶ 25. These records may later be released to higher education institutions to which A.K. will eventually apply, thus threatening her future academic career. Unless Defendants are enjoined from enforcing their unconstitutional policies, they remain free to continue to suppress A.K.'s future speech and punish her for her past speech. Plaintiff A.K. has thus demonstrated irreparable harm—"the single most important prerequisite for the issuance of a preliminary injunction." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (citation omitted).

### C. The Balance of Harms Tips in Plaintiff's Favor

"The third preliminary-injunction factor involves balancing the irreparable harm[] . . . against the harm that the preliminary injunction causes the [Defendants]." *Free the Nipple-Fort Collins*, 916 F.3d at 806 (internal citations omitted). Defendants cannot claim any real interest in suppressing the type of political, pro-gun-safety, pro-constitutional-rights speech in this case, and thus they cannot claim any legitimate "harm" in being prevented from suppressing the speech.

"When a constitutional right hangs in the balance . . . 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806. A.K. is indeed the only party who has suffered and who is at risk of suffering any real harm.

### D. An Injunction is in the Public Interest

"It's 'always in the public interest to prevent the violation of a party's constitutional rights,'" *Free the Nipple-Fort Collins*, 916 F.3d at 807, and this applies fully to A.K.

### E. No Security is Required or Appropriate

While "a trial court has 'wide discretion' under Rule 65(c) in determining whether to require security," *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003), for "costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), no such security is required or appropriate here. All A.K. seeks to do is to exercise her constitutionally protected free speech rights, without Defendants' unconstitutional interference, and there is no reason to believe Defendants would endure any financial harm in being prevented from disciplining A.K. for engaging in such speech activities. Thus, any requirement of security should be waived or set at a nominal level of $1.00.

### IV. CONCLUSION

A.K. respectfully requests this Honorable Court issue a temporary restraining order and/or preliminary injunction for the reasons set forth above.

Respectfully Submitted,

/s/ Eugene Volokh
385 Charles E. Young Dr. E.
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

/s/ Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804

/s/ Adam Kraut
Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org

law.rmd@gmail.com

Attorneys for Plaintiff