IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00392- PAB-NRN

A.K., a minor by and through KELLEY MOYER,

    Plaintiff,

v.

CHERRY CREEK SCHOOL DISTRICT NO. 5, *et al.*,

    Defendants.

---

## DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

---

Defendants Cherry Creek School District No. 5 (the "District"), Scott Siegfried, and Caroll Duran hereby respond to the temporary restraining order portion of Plaintiff A.K.'s motion for temporary restraining order and preliminary injunction (the "Motion") (Dkt. #35).[1]

### INTRODUCTION

A.K. remarkably seeks a temporary restraining order over six months after being suspended for a disruptive social media post and two and a half months after filing this lawsuit, during an unprecedented pandemic when schools are closed to in-person learning for the rest of the academic year. If A.K. truly faced an immediate and irreparable injury to her constitutional rights or college prospects, she would have acted sooner. As it stands, her unsupported request for interim emergency relief should be denied.

---

[1] Defendants will respond to the preliminary injunction portion of the Motion when directed by the Court or within the time permitted by the Rules of Civil Procedure.

**SUMMARY OF RELEVANT ALLEGED FACTS**

Along with many of her "friends and classmates," A.K. uses a social media application called Snapchat on her phone. (A.K. Decl., Dkt. No. 35-2, ¶ 1.) Snapchat allows users to share a photo and caption with contacts or anyone else using the application. (Am. Compl., Dkt. #13, ¶ 22.) Mid-morning on Thursday, October 10, 2019, apparently while at school, A.K. posted a photo of herself wearing a black scarf wrapped around her head. (*Id.* ¶ 23.) Several volleyball teammates messaged A.K. that they felt the post was racist. (*Id.* ¶ 24.) A.K. reposted the photo with the caption: "Allahu akbar (I live in America so fuck you if your [sic] offended, I can do what I want." (*Id.* ¶¶ 24–25.) Teammates responded with more complaints and threatened to report her to school administration. (*Id.* ¶ 26.)

Later that day after school, A.K. posted again on Snapchat:



(*Id.* ¶¶ 34–35.) The post "was not directed at anybody in particular and was posted for all to see."

(A.K. Decl. ¶ 14.) Two of her classmates who saw the post took screenshots, and a parent made a report to Safe2Tell. (Am. Compl. ¶ 44.) Safe2Tell is an "anonymous way for students, parents, school staff and community members to report concerns regarding their safety or the safety of others." *See* Safe2Tell website: www.safe2tell.org.

The next day, A.K. was suspended for five days. (Am. Compl. ¶¶ 48, 51.) Duran, the principal, explained to A.K., "When we see pictures of a 17-year-old holding an assault rifle, it sends panic through our building." (*Id.* ¶ 52.) Duran also told A.K. that her post "sent 'shockwaves of fear' throughout the school." (Jeff Moyer Decl., Dkt. #35-5, ¶ 10.) In a follow-up letter, Duran stated that A.K. was suspended for violating District Policies JKD-1-E and JICDA for "[b]ehavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel." (Am. Compl. ¶ 57.) The letter also stated that "any further incidents will result in additional consequences being taken by Endeavor." (*Id.* ¶ 60.) In response to A.K.'s grievance, the District noted multiple students had expressed concern about A.K.'s posts, with some even staying away from school. (Ex. 2 to Kelley Moyer Decl., Dkt. #35-4, p. 13.)

## STANDARD OF DECISION

"A temporary restraining order is extraordinary relief." *NRC Broad. Inc. v. Cool Radio, LLC*, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009). A party seeking one must show: (1) a substantial likelihood of winning on the merits; (2) irreparable injury; (3) which outweighs the damage the restraining order may cause the other party; and (4) a lack of adversity to the public interest. *Id.* In addition and as A.K. recognizes, "a party seeking a temporary restraining order also must demonstrate clearly, with specific factual allegations, that *immediate* and irreparable injury will result." *Id.* (emphasis added).

Because A.K. seeks an order requiring the District "to remove any disciplinary notations associated with her Oct. 10, 2019 post," she is seeking mandatory injunctive relief. Such a disfavored restraining order "must be more closely scrutinized," and A.K. "must make a *strong showing* both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Schrier v. Univ. Of Colo.*, 427 F.3d 1253, 1259–61 (10th Cir. 2005) (emphasis added); *see also Iowa Pac. Holdings, LLC v. Nat'l R.R. Passenger Corp.*, 2009 WL 5216938, at *1 (D. Colo. Dec. 23, 2009) (applying same to request for restraining order).

## ARGUMENT

### A. A.K. Waited Months to Seek a Temporary Restraining Order and Is Not Facing Any Immediate and Irreparable Injury, Especially with School Closed.

A.K. has waited over *six months* after her alleged injury to seek emergency relief. She was suspended on October 11, 2019, she filed this lawsuit on February 14, 2020, and she filed the Motion on April 30, 2020. Such extensive delay belies any argument of immediate harm, let alone any genuine need for a temporary restraining order. *See, e.g., GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) ("[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."); *cf. Daugomah v. Roberts*, 2016 WL 4991693, at *3 (W.D. Okla. Sept. 16, 2016) ("Plaintiff's choice to file this action on the eve of completion of the election, when Plaintiff has been aware of the pending election process for at least several months, militates against the notion that emergency relief based on expedited proceedings to prevent imminent and irreparable harm is called for here.").

A.K. asserts the District may release her discipline records to colleges. This is entirely speculative. *See, e.g.*, *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[P]urely speculative harm does not amount to irreparable injury . . . ."). A.K. has not even applied

4

to any college yet, and no requests for her discipline records have been submitted. The time to apply for a temporary restraining order would be *after* A.K. applies to a college and a request for her disciplinary records is made. Only then could any potential harm be immediate. *See, e.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("[T]he moving party must first demonstrate that such injury is *likely* before the other requirements for the issuance of an injunction will be considered.") (emphasis added).

A.K. also worries the District may discipline again her if she posts something "similar." This cry of an ongoing prior restraint rings hollow and is speculative at best. She does not identify any specific message she has been discouraged from posting—just a general desire to post photos of her holding firearms, and there are no posts currently at issue. *See Berger v. City & Cty. of Denver*, 2019 WL 2450955, at *5 (D. Colo. June 11, 2019) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Again, the time to seek emergency relief would be after A.K. has posted something else and the District begins a disciplinary response. Even so, it seems very unlikely that A.K. would face discipline for any social media activity in the foreseeable future. As her mother acknowledges, school is closed for the rest of the year due to the COVID-19 pandemic. (Kelley Moyer Decl. ¶¶ 26–27.) There currently is no centralized physical learning environment for A.K. to disrupt by causing fear of mass gun violence.

While there can be a presumption of irreparable injury when a constitutional violation is alleged, A.K. must still show that harm is "imminent." *Pinson v. Pacheco*, 397 F. App'x 488, 491–92 (10th Cir. 2010) (explaining even constitutional harm must be "of such *imminence* that there is a clear and present need for equitable relief"). A.K. further fails to benefit from the presumption

because, as discussed below, she has not made a strong showing of likelihood of success on the merits of her free speech claims. *See Schrier*, 427 F.3d at 1266 (denying injunctive relief to movant who did not prove he was likely to succeed on First Amendment claim). Moreover, the District has given no indication that it would discipline A.K. for *any* social media post showing her holding a gun. District Policies JKD-1-E and JICDA encompass conduct detrimental to the welfare, safety, or morals of other students or school personnel (Ex. C. to Am. Compl., Dkt. #13-1, pp. 10, 12.) The goal is "to maintain an environment in the schools, which is conducive to learning, protective of the safety and welfare of students and staff, and free from unnecessary disruption," without "infring[ing] upon constitutionally protected rights." (*Id.* at 9.) Here, the full context of A.K.'s posts is critical to how her message was received, and Duran made clear that A.K. was suspended after her post caused "panic" and "sent 'shockwaves of fear' throughout the school." (Am. Compl. ¶ 52; Jeff Moyer Decl., Dkt. #35-5, ¶ 10.)

### B. It is Well Established that Schools Can Regulate Off Campus Speech, and A.K. Has Not Made a Strong Showing of Likelihood of Success on the Merits.

A.K.'s claims depend on an extremely narrow and antiquated reading of a school's authority to regulate student conduct that falls well short of the strong showing of likely success on the merits required for a temporary restraining order. While the Supreme Court and the Tenth Circuit have not expressly applied the standard articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), to off-campus speech, the vast majority of federal appellate courts to consider the issue have done so, largely because social media is pervasive. *See, e.g., Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 393 (5th Cir. 2015) ("[O]f the six circuits to have addressed whether [a school can regulate] . . . off-campus speech, five, including our own, have held [they can]. (For the other of the six circuits (the third circuit), there

is an intra-circuit split).") Indeed, *no* federal appellate court has held schools can never regulate off-campus speech.

Here, it was reasonably foreseeable that A.K.'s posts would reach her school and cause a substantial disruption. *See, e.g., Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008); *see also West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1365 (10th Cir. 2000) (applying similar formulation of *Tinker* standard to on-campus speech). Visually, the third post speaks for itself, with two individuals wearing headscarves and menacingly brandishing a large handgun and imposing assault rifle against the backdrop of the Confederate battle flag, well-recognized as a "racially divisive symbol." *Id.* at 1368. The context of the post does nothing to disarm it and suggests instead that A.K. was escalating. She already had received complaints from classmates earlier in the day at school after posting a photo of herself in a headscarf with the caption "Allahu akbar"—an Arabic religious phrase that has been appropriated by jihad terrorists. The post also was made in a Snapchat group that included classmates, and A.K. did not limit the distribution of her post despite knowing her previous posts were causing concern. Finally, while unnecessary under *Tinker*, *see id.* at 1366, A.K.'s allegations indicate her posts did, in fact, cause actual disruption of the educational environment, with fear and panic travelling throughout the school such that multiple parents and students reported concern and even stayed home. *Cf. Spero v. Vestal Cent. Sch. Dist. No. 317*, 2019 WL 6840175, at \*\*2, 6 (N.D.N.Y. Dec. 16, 2019) (finding school's forecast of substantial disruption was reasonable where student posted video showing woman handling firearm).

A.K.'s challenges to District Policies JKD-1-E and JICDA similarly fail to justify interim emergency relief. Striking down policies as facially overbroad is "strong medicine" to be

employed "only as a last resort." *West*, 206 F.3d at 1367. The District's Policies have limiting language, and there is no realistic danger that they will compromise established First Amendment rights of other students. Policy JICDA states that District conduct and discipline rules "shall not infringe upon constitutionally protected rights." (Ex. C. to Am. Compl., Dkt. #13-1, p. 9.) While Policy JKD-1-E allows suspensions or expulsions for "[b]ehavior on or off school property," the behavior must be "detrimental to the welfare or safety of other pupils or of school personnel." (*Id*. at 13.) Moreover, Policy JICED, which A.K. does not acknowledge and which is subject to judicial notice, more specifically recognizes "student expression rights." (Ex. 1, p. 1.) Discipline is limited to expression that "[c]reates a clear and present danger of . . . the material and substantial disruption of the orderly operation of the school." (*Id*.) A.K. also complains that District Policies JICDA and JKD-1-E are unconstitutionally vague because they allow discipline for conduct that is "detrimental" to "welfare," "safety," or "morals." (Mot. at 12.) This language comes directly from § 22-33-106(1)(c), C.R.S. In *People in Interest of K.P.*, 514 P.2d 1131, 1133 (Colo. 1973), the Colorado Supreme Court rejected a vagueness challenge to that statutory language, concluding "the legislature has provided factors in sufficiently clear and definite language to apprise students of the type of conduct which is prohibited."

      **C.**    **Issuing a Temporary Restraining Order Would Be Against the Public Interest and Will Cause More Harm to the District than A.K. Would Face Without One.**

As discussed above, A.K.'s alleged harm is neither actual nor imminent. The District, in contrast, must be permitted to reasonably enforce its discipline policies. Current online learning may be subject to different types of disruption, but it is still an educational environment in which student wellbeing must be protected and order must be maintained. "[W]hile '[i]t is always in the

public interest to protect constitutional rights,' . . . there is also no question that 'protecting the safety of school [students and] staff is undoubtedly a significant government interest." *McKinney as Next Friend of K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 772 (W.D. Ark. 2018) (quoting *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008); *Lovern v. Edwards*, 190 F.3d 648, 655–56 (4th Cir. 1999)); *see also Epperson v. State of Ark.*, 393 U.S. 97, 104, (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.").

A.K.'s proposed order would vaguely restrain the District "from enforcing [its] policies, practices, and customs inconsistent with the First, Fifth, and Fourteenth Amendments." (Proposed Order, Dkt. #35-6, p. 1.) Without any specific detail of what conduct cannot be disciplined, the order A.K. requests is not one the District could comply with in good faith. The result would be confusion and a chilling of discipline for conduct even A.K. may find unprotected. The proposed order also would restrain the District "from taken [sic] further disciplinary actions against [her] based on any future protected speech activities relating to firearms." (*Id.* at 1–2.) Again, what is "protected" is left unsaid, leaving the District with no reasonable guidelines. A.K.'s proposed order ultimately proves the District's point above that this is not the case for interim emergency relief. Lacking immediate harm tied to specific speech or discipline, A.K. is left asking to restrain the District's disciplinary power generally, and she has failed to limit the reach of her request to any reasonable or workable degree.

## CONCLUSION

Defendants respectfully request that the Court deny A.K.'s motion for a temporary

restraining order. She has waited months to seek a temporary restraining order and is not facing any immediate and irreparable injury, particularly with the District's schools closed for the rest of the academic year. It also is well established that schools can regulate off campus speech, and A.K. has not made a strong showing of likelihood of winning her claims. A.K.'s alarming post showing her and a man with their faces covered and menacingly brandishing semiautomatic firearms caused a reasonably foreseeable substantial disruption at her school. Finally, A.K. seeks a vague restraining order that is not in the public interest and would harm the District during online learning because it would chill lawful discipline. A.K.'s counsel would be wise to withdraw her unsupported request before further costs and fees are incurred.

RESPECTFULLY SUBMITTED this 4th day of May, 2020.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: *s/ Jonathan P. Fero*
Michael Brent Case
Jonathan P. Fero
Daniel P. Spivey
1120 Lincoln Street, Suite 1308
Denver, CO  80203
(303) 595-0941
bcase@semplelaw.com
jfero@semplelaw.com
dspivey@semplelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2020, a correct copy of the foregoing **DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER** was filed via CM/ECF and served on the following:

Adam Kraut, Esq.
Joseph Greenlee, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
akraut@fpclaw.org
jgreenlee@fpclaw.org

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
law.rmd@gmail.com

Eugen Volokh
385 Charles E. Young Dr. E
Los Angeles, CA 90095
volokh@law.ucla.edu

*Attorneys for Plaintiff*

By: *s/ Elaine Montoya*