IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00392-PAB-NRN

A.K., a minor by and through KELLEY MOYER,

    Plaintiff,

v.

CHERRY CREEK SCHOOL DISTRICT NO. 5, *et al.*,

    Defendants.

_____

## DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
_____

Defendants Cherry Creek School District No. 5 ("District"), District Board of Education, Scott Siegfried, and Caroll Duran hereby respond to the preliminary injunction portion of Plaintiff A.K.'s motion for temporary restraining order and preliminary injunction ("Motion") (Dkt. #35).

## INTRODUCTION

A.K. filed for a temporary restraining order and preliminary injunction over six months after being suspended for disruptive social media posts and two and a half months after filing this lawsuit. A.K.'s request for a temporary restraining order was denied on May 6, 2020, primarily because the alleged harm was too speculative and remote. (Dkt. #39.) Nothing has changed in the last two weeks to make A.K.'s alleged harm any less speculative or remote. A.K. also has not made a strong showing of likelihood of success on the merits or on the balancing of harms. Her request for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

A.K. is a high school senior at Endeavor Academy. (Am. Compl., Dkt. #13, ¶ 3.) Along

with many of her "friends and classmates," A.K. uses a social media application called Snapchat on her phone. (A.K. Decl., Dkt. #35-2, ¶ 3.) Snapchat allows users to share a photo and caption with contacts or anyone else using the application. (Am. Compl., Dkt. #13, ¶ 22.) Mid-morning on Thursday, October 10, 2019, apparently while at school, A.K. posted a photo of herself wearing a black scarf wrapped around her head. (*Id*. ¶ 23.) Several volleyball teammates messaged A.K. that they felt the post was racist. (*Id*. ¶ 24.) Classmates then reported to Endeavor Principal Caroll Duran that they believed A.K.'s post was racist, as it depicted her in traditional Muslim attire. (Ex. A, Caroll Duran Decl. ¶ 6.) Students also reported to Ms. Duran that when they tried to talk to A.K. about the post, she became very combative. (*Id*.) A.K. went to Ms. Duran's office and was told other students thought the post was racist; Ms. Duran also suggested A.K. should be more thoughtful when posting on social media. (*Id*. ¶¶ 7–8.)

A.K. then reposted the photo with the caption: "Allahu akbar (I live in America so fuck you if your [sic] offended, I can do what I want." (Am. Compl. ¶ 25.) In response, she received more complaints from classmates. (*Id*. ¶ 26.) Ms. Duran similarly received more reports from students, complaining the second post was offensive and racist, so Ms. Duran called A.K. back to her office. (Duran Decl. ¶¶ 9–11.) Ms. Duran told A.K. that her post was highly inappropriate and reiterated she should be more thoughtful on social media. (*Id*. ¶ 11.) Ms. Duran felt she could have disciplined A.K., given the inappropriate and offensive nature of the posts and A.K.'s apparent aim to incite conflict with classmates. (*Id*. ¶ 12.)

Later that day after school, A.K. posted again on Snapchat. (Am. Compl. ¶¶ 34–35.) The post "was not directed at anybody in particular and was posted for all to see." (A.K. Decl. ¶ 14.) Two of her classmates who saw the post took screenshots, and a parent made a report to Safe2Tell.

(Am. Compl. ¶ 44.) Safe2Tell is an anonymous way for individuals to report safety concerns connected with schools. (*Id.*) As shown in paragraph 35 of the Complaint, the post was as follows:



That evening, Ms. Duran received a call from Endeavor teacher and volleyball coach Joseph Silipo. (Duran Decl. ¶ 13.) Mr. Silipo and Amy Fischer, another Endeavor teacher and coach, received multiple complaints from volleyball players and parents about A.K.'s third post. (*Id.*) The reports expressed fear for student safety, especially given A.K.'s inciting behavior earlier in the day and the image of the Confederate battle flag. (*Id.* ¶ 15.) After seeing the third post, Ms. Duran became highly concerned for the safety and well-being of the Endeavor student body, due to the escalating nature of A.K.'s posts, the apparent aim of inciting conflict with peers, the display of guns and Confederate flag, and A.K.'s past behaviors and mental health issues. (*Id.* ¶ 16.) That evening, Ms. Duran called Carla Stearns, District Executive Director of High Schools, to discuss the posts, and it was decided Ms. Duran would have the police do a welfare check on A.K. (*Id.* ¶ 17.) The Aurora Police Department ultimately went to A.K.'s house. (Am. Compl. ¶¶ 45–46.)

During Ms. Duran and Ms. Stearns's call, it also was decided that A.K. would be escorted by security to Ms. Duran's office upon her arrival at Endeavor the next morning. (Duran Decl. ¶ 17.) Ms. Duran felt A.K. had likely violated District Policies JKD-1-E and JICDA for "[b]ehavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel." (*Id.*; Ex. C to Am. Compl., Dkt. #13-1, pp. 10, 13.) The next morning, October 11, 2019, Ms. Duran called Ms. Stearns and discussed a potential five-day suspension for A.K. (Duran Decl. ¶ 18.) Ms. Duran, however, had not made a decision so that A.K. would have an opportunity to tell her side of the story. (*Id.*)

Concerned that the police had come to their house, A.K.'s mother and stepfather accompanied her to Endeavor, and upon their arrival they were escorted by security to the main office. (Am. Compl. ¶¶ 47–48.) Ms. Duran, Assistant Principal Matthew Larson, A.K., and her parents met in a conference room. (Duran Decl. ¶ 20.) Contrary to A.K.'s allegation, Ms. Duran did not open the meeting by stating that A.K. was suspended for five days. (*Id.*) A.K.'s parents were aggressive with Ms. Duran, with A.K.'s father threatening Ms. Duran that she "just pissed off a marine." (*Id.* ¶ 21.) It was difficult for Ms. Duran to converse with A.K. and her parents because her parents kept cutting her off. (*Id.*) Ms. Duran asked A.K. to tell her side of the story and requested that she undergo a threat assessment, but her parents refused to permit a threat assessment, and A.K. refused to tell her side of the story. (*Id.*) Ms. Duran tried to explain to A.K. and her parents that other students and parents had reported safety concerns due to A.K.'s posts. (*Id.* ¶ 22.) Once it became clear A.K. was not going to provide a response, Ms. Duran stated A.K. would be suspended for five days based on the District's "detrimental behavior" policy. (*Id.*) School Resource Officer Mark Keaney has an office in the main office area and he stood in the

4

lobby of the main office during the meeting. (*Id*. ¶ 24.) Ms. Duran did not ask Officer Keaney to observe or stand near where the meeting took place. (*Id*. ¶ 25.)

In a follow-up letter emailed to A.K.'s mother that afternoon, Ms. Duran stated that A.K. was suspended for violating District Policies JKD-1-E and JICDA for "[b]ehavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel." (Am. Compl. ¶ 57; Duran Decl. ¶ 29.) The letter also stated that "any further incidents will result in additional consequences being taken by Endeavor." (Am. Compl. ¶ 60; Duran Decl. ¶ 30.) This sentence is a template sentence used in student discipline letters to remind students that further violations of District policies will result in discipline. (Duran Decl. ¶ 30.)

Throughout the day on October 11, 2019, Ms. Duran received calls from parents saying they were keeping their children home from school for safety concerns resulting from A.K.'s posts, and multiple students were kept home that day. (*Id*. ¶ 26.) Ms. Duran spoke with Principal Mark Morgan of Cherry Creek Innovation Campus ("CCIC"), who reported he also had received concerns from students and parents about A.K.'s posts. (*Id*. ¶ 27; Ex. B, Mark Morgan Decl. ¶¶ 4–5, 7.) CCIC is a District program where high school students can participate in career or technical education to prepare them for work or further education in college. (*Id.* ¶ 3.) Students attend CCIC from other District high schools for specific courses, and A.K. took a course at CCIC. (Duran Decl. ¶ 28; Morgan Decl. ¶ 3.) At least two students did not attend a CCIC class they had with A.K. expressly because of A.K.'s posts, and another student was late to class after speaking with CCIC staff about the posts. (Morgan Decl. ¶ 6.) Further, only 10 of 20 students attended A.K.'s CCIC class on October 11th. (*Id*.) CCIC is typically well attended, and it is highly unusual for half of the students in a class to be absent on any given day. (*Id*.)

5

Before A.K. returned from her five-day suspension, Ms. Duran met with Ms. Fischer, Endeavor school psychologist Jennifer Gherardini, Endeavor social worker Luz Navarrete, and the volleyball team to process concerns about reentry. (Duran Decl. ¶ 32.) Many volleyball team members were uncomfortable with A.K., given the racial and offensive nature of her posts— particularly her wearing Muslim attire, her use offensive use of a Muslim phrase, her aim of inciting conflict with classmates, and the display of the Confederate flag. (*Id*.) Endeavor administration then created a reentry plan for A.K. with input from her mother. (*Id*. ¶¶ 33–34.) Due to concerns for A.K.'s safety, part of the plan provided that she was to go to the Endeavor counselor's office during times when she had a free period, and this lasted for roughly two months. (*Id*. at 33.) A.K. was otherwise permitted to attend her classes normally. (*Id*.)

Media outlets reported on A.K.'s suspension, and Ms. Duran, her family, and school staff received threatening phone calls about A.K.'s rights. (*Id*. ¶ 38.) Ms. Duran is Hispanic and Native American, and some callers told her to get out of "our country." (*Id.*) On October 21, 2019, a semi-trailer truck parked in front of the school with a large Confederate flag draped across its side. (*Id*.)

A.K. needs 22 credits to graduate and likely will not graduate until December 2020 at the earliest. (*Id*. ¶ 35.) She currently has a cumulative GPA of 1.96. (*Id*. ¶ 36.)

District Policy JICDA states that District conduct and discipline rules "shall not infringe upon constitutionally protected rights." (Ex. C. to Am. Compl., Dkt. #13-1, p. 9.) District Policy JICED more specifically recognizes "student expression rights" and states that discipline is limited to expression that "[c]reates a clear and present danger of . . . the material and substantial disruption of the orderly operation of the school." (Ex. C, p. 1.)

## STANDARD OF DECISION

"[A] preliminary injunction is an extraordinary remedy," and "the right to relief must be clear and unequivocal." *Schrier v. Univ. Of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted). The movant must meet four prerequisites: (1) a substantial likelihood of prevailing on the merits; (2) irreparable injury unless injunctive relief is provided; (3) injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. *E.g.*, *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).

Because A.K. seeks an order requiring the District "to remove any disciplinary notations associated with her Oct. 10, 2019 post," she is seeking mandatory injunctive relief. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 979 (10th Cir. 2004). As such, her request "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id*. at 975. "[A] party seeking such an injunction must make a ***strong showing*** both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id*. at 976. (emphasis added).

## ARGUMENT

### A.    A.K. Is Not Facing Irreparable Harm.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation omitted). "[M]erely serious or substantial" harm is not enough. *Id.* Additionally, "the injury complained of" must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. A.K. was suspended on October 11, 2019, she filed this lawsuit on February 14, 2020, and she filed the Motion on April 30, 2020. "[D]elay is an important consideration in

7

the assessment of irreparable harm . . . ." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). As this Court found in its Order denying the temporary restraining order, A.K.'s five-month "delay in seeking injunctive relief cuts against [her] assertions of imminent irreparable harm." (Dkt. #39 at 7 n.1.)

A.K. asserts the District *may* release her discipline records to colleges. This is entirely speculative, as noted by the Court in its Order. (Dkt. #39 at 4–5.); s*ee also, e.g.*, *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[P]urely speculative harm does not amount to irreparable injury . . . ."). A.K. has not even applied to any college yet, and no requests for her discipline records have been submitted. She maintains she will "eventually" apply, but possible harm is neither imminent nor likely. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Indeed, A.K. will not be graduating at least until December 2020, and she currently has a GPA of 1.96. (Duran Decl. ¶¶ 34, 36.) Even *if* she applies to colleges, *if* at least one requests her disciplinary history, and *if* the District provides it, yet another leap of speculation is needed to conclude a five-day suspension would affect her prospect of admission.

A.K. also worries the District may discipline her again if she posts something "similar." However, A.K. does not identify any specific message she has been discouraged from posting— just a general desire to post photos of her holding firearms, and there are no posts currently at issue. All that is alleged is A.K.'s subjective belief that she is being chilled from some unspecified potential speech, and that is not enough. *See Berger v. City & Cty. of Denver*, 2019 WL 2450955, at \*5 (D. Colo. June 11, 2019) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Further, it seems very unlikely that A.K. would face discipline for any social media activity in the foreseeable

future. Due to the COVID-19 pandemic and the imminent end of the school year, there is no centralized physical learning environment for A.K. to disrupt by causing fear of mass gun violence. As noted by the Court, A.K. does not explain why making a similar post will likely subject her to discipline or why there has been a significant impact on her Snapchat posting habits. (Dkt. #39 at 6.); *see also, e.g.*, *Johnson v. Cache Cty. Sch. Dist.*, 323 F. Supp. 3d 1301, 1316 (D. Utah 2018) ("Plaintiff has not shown that the alleged censorship" of her Snapchat posting is "great or substantial" as required for irreparable harm).

While there can be a presumption of irreparable injury when a constitutional violation is involved, this Court made clear that A.K. must do more than merely allege a constitutional violation. (Dkt. #39 at 4–5.) *See id.* at 1314; *Bauchman v. W. High Sch.*, 900 F. Supp. 248, 251 n.3 (D. Utah 1995). Also, to take advantage of the presumption, A.K. must make a strong showing of likelihood of success on the merits of her First Amendment claim. *See Schrier*, 427 F.3d at 1266; *O Centro*, 389 F.3d at 979. As discussed below, she does not (and cannot) do so.

Because A.K. has not established irreparable injury, her request for a preliminary injunction should be denied. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("[T]he moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.").

**B.     A.K. Has Not Made a Strong Showing of Likelihood of Success on the Merits.**

**1.     A.K.'s First Amendment claims.**

A.K.'s free speech claim depends on an extremely narrow and antiquated reading of a school's authority to regulate student conduct that falls well short of a strong showing of likely success on the merits. Under *Tinker v. Des Moines Independent Community School District*, 393

9

U.S. 503 (1969), a school may restrict private student expression if it "reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 36 (10th Cir. 2013). While the Supreme Court and the Tenth Circuit have not expressly applied the standard articulated in *Tinker* to off-campus speech, the vast majority of federal appellate courts to consider the issue have done so, largely because social media is pervasive. *See, e.g., Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 393–94 (5th Cir. 2015). Indeed, *no* federal appellate court has held schools can never regulate off-campus speech.

A.K. does not appear to dispute *Tinker's* application to off-campus speech; rather, she argues *Tinker* does not apply because her posts made no reference to the school or anyone associated with it. However, it is not necessary that A.K. directed her off-campus speech to the Endeavor community. Under *Tinker*, the "test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012). It is enough that it was "foreseeable the off-campus expression might also reach campus" or that "based on the totality of the circumstances," the posts "bear[] a sufficient nexus to the school." *Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008); *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 707 (9th Cir. 2019); *cf. Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011) (finding nexus in student MySpace activity).

A sober look at A.K.'s alarming and offensive posts shows her free speech claim is unlikely to succeed. In the third post, two individuals wearing Muslim headscarves menacingly brandish a large handgun and imposing assault rifle against the backdrop of the Confederate flag, widely regarded as a "racially divisive symbol." *West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358,

1368 (10th Cir. 2000). The full context does nothing to disarm the post and suggests instead that A.K. was escalating her aim to incite other students. Her posts were made in a Snapchat group that clearly included Endeavor classmates and volleyball teammates, and according to Duran, they "were spreading like wildfire among students." (Duran Decl. ¶ 10.) A.K. admittedly had received complaints of racism from classmates and been warned by Ms. Duran earlier in the day after posting two photos of herself in a Muslim headscarf—the second with the caption "Allahu akbar," an Arabic religious phrase that has been appropriated by jihad terrorists. (Am. Compl. ¶¶ 23–26; Duran Decl. ¶¶ 9–11.) Despite knowing her previous posts were causing a lot of concern, A.K. chose not to limit the distribution of her third post in any way. (*See* A.K. Decl. ¶ 14.) Under the totality of the circumstances, which included A.K.'s past dark behaviors and mental health challenges, (Duran Decl. ¶¶ 16, 37), it was reasonably foreseeable the third post would rapidly reach the Endeavor community and cause a substantial disruption.

A.K. stands heavily on her constitutional right to bear arms, but mentioning the gun range did not insulate her from discipline. *See, e.g.*, *Parker v. Dist. of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *aff'd, Dist. of Columbia v. Heller*, 554 U.S. 570, 625 (2008). The intimidating display of semiautomatic weapons in her third post strengthens the decision to discipline her. *Cf. Spero v. Vestal Cent. Sch. Dist. No. 317*, 427 F. Supp. 3d 294, 305 (N.D.N.Y. 2019) (recognizing schools have heightened interest in regulating posts involving firearms and finding forecast of substantial disruption was reasonable where student posted video showing woman handling gun).[1]

---

[1] A.K. also seems to suggest she could not be punished because her third post cannot be considered a "threat." The District is not claiming her speech was unprotected for that reason. Moreover, A.K. cites no authority for her suggestion that disruptive speech cannot be regulated if it was not a true threat, and several Circuits expressly hold otherwise. *See Bell*, 799 F.3d at 400 (holding no need to analyze student's speech under "true threat" analysis since it meets *Tinker* standard); *Wynar v.*

11

Furthermore, while unnecessary under *Tinker*, *see West*, 206 F.3d at 1366, A.K.'s posts did, in fact, cause actual disruption of the educational environment, with fear and panic travelling throughout Endeavor and CCIC such that multiple parents and students reported safety concerns. (Duran Decl. ¶¶ 15, 26–27; Morgan Decl. ¶¶ 4–5.) Many students were kept home on October 11th, and there were an unprecedented number of absences from A.K.'s class at CCIC. (Duran Decl. ¶¶ 26–27; Morgan Decl. ¶ 6.) Ms. Duran and her staff also received threatening calls, and a semi-trailer truck displayed a large Confederate flag outside Endeavor. (Duran Decl. ¶ 38.)

A.K. argues the District engaged in content-based discrimination by "restrict[ing] A.K.'s speech because of . . . what it said and depicted." Yet, such a claim is not in the Complaint, and A.K. does not detail what particular content or viewpoint the District discriminated against. Even so, the weight of authority holds a viewpoint discrimination analysis has no place in cases involving student discipline for speech causing a substantial disruption. *See, e.g.*, *Taylor*, 713 F.3d at 36 ("*Tinker* governs private student speech."); *compare also B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 740 (8th Cir. 2009) ("[V]iewpoint discrimination by school officials is not violative of the First Amendment if the *Tinker* standard . . . is met."), *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1184–85 (9th Cir. 2006) (same), *rev'd on other grounds*, 549 U.S. 1262 (2007), *and Morgan v. Swanson*, 659 F.3d 359, 379 (5th Cir. 2011) (stating there is "no categorical prohibition on viewpoint discrimination" in school speech cases), *with Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008) (examining school's regulation for viewpoint discrimination).

---

*Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1069 & n.7 (9th Cir. 2013) (same); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007) (same).

A.K. likewise fails to strongly show she will win her prior restraint claim, which is based on one sentence in Ms. Duran's October 11, 2019 letter, stating "any further incidents will result in additional consequences being taken by Endeavor." (Am. Compl. ¶¶ 60, 71.) As noted above, A.K.'s alleged subjective belief that she is being chilled from unspecified potential speech is insufficient. *See Berger*, 2019 WL 2450955, at *5. The sentence is template language to remind students that violations of District policies will result in discipline. (Duran Decl. ¶ 30.) There was no intent to chill protected speech, and A.K. cannot show any objective fear of real future harm.

### 2. A.K.'s facial challenges.

A.K.'s challenges to District Policies JKD-1-E and JICDA similarly fail to show a strong likelihood of success on the merits. Striking down policies as facially overbroad is "strong medicine" to be employed "only as a last resort." *West*, 206 F.3d at 1367. The District's Policies have limiting language, and there is no realistic danger they will compromise established First Amendment rights of other students. Policy JICDA states the District's conduct and discipline rules "shall not infringe upon constitutionally protected rights." (Ex. C. to Am. Compl., Dkt. #13-1, p. 9.) While Policy JKD-1-E allows suspensions or expulsions for "[b]ehavior on or off school property," the behavior must be "detrimental to the welfare or safety of other pupils or of school personnel." (*Id*. at 13.) Moreover, Policy JICED, which A.K. does not acknowledge, but is beyond reasonable dispute, expressly recognizes "student expression rights." (Ex. C, p. 1.) Consistent with *Tinker*, discipline is limited to expression that "[c]reates a clear and present danger of . . . the material and substantial disruption of the orderly operation of the school." (*Id*.)

A.K. also complains Policies JICDA and JKD-1-E are unconstitutionally vague because they allow discipline for conduct that is "detrimental" to "welfare," "safety," or "morals." This

13

language comes from § 22-33-106(1)(c), C.R.S. In *People in Interest of K.P.*, 514 P.2d 1131, 1133 (Colo. 1973), the Colorado Supreme Court rejected an analogous challenge, concluding "the legislature has provided factors in sufficiently clear and definite language to apprise students of the type of conduct which is prohibited." Further, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process," disciplinary rules need not be overly detailed. *West*, 206 F.3d at 1368; *see also Wiemerslage v. Me. Twp. High Sch. Dist. 207*, 29 F.3d 1149, 1151 (7th Cir. 1994) (explaining for school discipline rules, "flexibility or breadth should not necessarily be confused for vagueness").[2]

### C. Issuing an Injunction Would Be Against the Public Interest and Will Cause More Harm to the District Than A.K. Would Face Without One.

As discussed above, A.K.'s alleged harm is remote and speculative. The District, in contrast, must be permitted to reasonably enforce its discipline policies into the upcoming school year, whether or not in-person learning resumes. "[W]hile '[i]t is always in the public interest to protect constitutional rights,' . . . there is also no question that 'protecting the safety of school [students and] staff is undoubtedly a significant government interest." *McKinney as Next Friend of K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 772 (W.D. Ark. 2018) (quoting *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008); *Lovern v. Edwards*, 190 F.3d 648, 655–56 (4th Cir. 1999)); *see also Epperson v. State of Ark.*, 393 U.S. 97, 104, (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities.") In Colorado, safe schools are not just a moral imperative; they are a statutory duty subject to a limited waiver of sovereign immunity. § 24-10-106.3(3), C.R.S.

---

[2] A.K. does not advance the merits of her due process claim in support of a preliminary injunction.

A.K.'s proposed order would vaguely restrain the District "from enforcing [its] policies, practices, and customs inconsistent with the First, Fifth, and Fourteenth Amendments." (Dkt. #35-6, p. 1.) Without any specific detail of what conduct cannot be disciplined, the order A.K. requests is not one the District could comply with in good faith. The result would be confusion and a chilling of discipline for conduct even A.K. may find unprotected. The proposed order also would restrain the District "from taken [sic] further disciplinary actions against [her] based on any future protected speech activities relating to firearms." (*Id.* at 1–2.) Again, what is "protected" is left unsaid, leaving the District with no reasonable guidelines. Lacking irreparable harm tied to specific speech, A.K. is left asking to enjoin the District's disciplinary power generally, and she has failed to limit the reach of her request to any reasonable or workable degree.

## CONCLUSION

Defendants respectfully request that the Court deny A.K.'s motion for a preliminary injunction. She has waited months to seek injunctive relief and is not facing any irreparable injury. It also is well established that schools can regulate off campus speech, and A.K. has not made a strong showing of likelihood of winning her claims. Moreover, A.K. seeks a vague injunction that is against the public interest and would harm the District because it would chill lawful discipline.

RESPECTFULLY SUBMITTED this 21st day of May, 2020.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: *s/ Jonathan P. Fero*
  Michael Brent Case
  Jonathan P. Fero
  Daniel P. Spivey
  1120 Lincoln Street, Suite 1308,
  Denver, CO  80203, (303) 595-0941
  bcase@semplelaw.com, jfero@semplelaw.com
  dspivey@semplelaw.com

## CERTIFICATE OF SERVICE

       I hereby certify that on the 21st day of May, 2020, a correct copy of the foregoing **DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** was filed via CM/ECF and served on the following:

Adam Kraut, Esq.
Joseph Greenlee, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
akraut@fpclaw.org
jgreenlee@fpclaw.org

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
law.rmd@gmail.com

Eugene Volokh
385 Charles E. Young Dr. E
Los Angeles, CA 90095
volokh@law.ucla.edu

*Attorneys for Plaintiff*

                                          By: *s/ Elaine Montoya*