**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **A.K.,** a minor, by and through **KELLEY MOYER**, Plaintiff<br><br>    **v.**<br><br>**CHERRY CREEK SCHOOL DISTRICT NO. 5,** *et al.***,** Defendants | Civil Action No. 1:20-cv-00392 |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

## I.    INTRODUCTION

A.K. engaged in constitutionally protected ideological speech from her home, outside school hours, without using school property, and without mentioning any teachers, staff, or students. Yet defendants punished her—a high school student at CCSD's Endeavor Academy—for that speech. This violated her First Amendment rights as applied, was carried out under policies that were unconstitutionally vague and overbroad, and was imposed without the due process to which she was entitled. Defendants move to dismiss the case on the basis that A.K.'s claims "fail as a matter of law." But such a motion "may be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling her to relief under her theory of recovery." *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). The complaint need assert "only enough facts to state a claim to relief that is plausible on its face." *Bell v. Twombly*, 550 U.S. 544, 570 (2007); *accord Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A.K. easily meets this lenient standard, and thus defendants' motion should be denied.

## II.   STATEMENT OF FACTS

The allegations in support of A.K.'s case,[1] which the Court must "accept[] as true" and

view "in the light most favorable" to her, *Walker v. Mohiuddin*, 947 F.3d 1244, 1249 (10th Cir.

2020), establish the following: On the evening of October 10, 2019, A.K. was at home getting

ready to go to target practice at the Centennial Gun Club with her older brother, an Army veteran.

First Amended Complaint (FAC) ¶31. Before leaving, they posed for a picture with headscarves

and firearms (A.K. had a semiautomatic pistol and her brother a semiautomatic rifle), while "flip-

ping off" the camera. FAC ¶¶34-36. A.K. posted it to her Snapchat account with this caption:

> me and my legal guardian are going to the gun range to practice gun safety and
> responsible gun ownership while getting better so we can protect ourselves while
> also using the first amendment to practice our second ammendment [sic].

FAC ¶¶22, 35-38.

A.K.'s speech was not directed at any particular Snapchat contacts. FAC ¶¶21-22, 39, 42.

Later that evening, someone reported the post to Safe2Tell Colorado, and police officers went to

the home of A.K.'s father, Chad Johnson, to inquire. *Id.* at ¶¶44-45. The Police Department ulti-

mately apologized for bothering him, saying they saw nothing threatening in the post. *Id.* at ¶46.

The following morning, October 11, 2019, A.K.'s mother (Kelley Moyer) and her husband

(Jeff Moyer), concerned about the police visit, accompanied A.K. to school. FAC ¶47. Principal

---

[1]   As defendants note in relying on declarations A.K. filed to support her motion for prelim-
inary injunctive relief, the Court may consider such additional allegations the plaintiff has made
without converting the matter into a motion for summary judgment. MTD 2, n.1 (citing *Bryan v.
Tessier*, 2014 WL 3359401, at *8 (D. Colo. 2014)). Here, this would include the declarations A.K.
submitted in reply to defendants' opposition to the preliminary injunction. Doc. 56-1, 56-2.

Duran and Assistant Principal Larson were waiting for them. *Id.* at ¶¶48-49. Duran said she assumed Mr. and Mrs. Moyer were there because of the Snapchat photo. FAC ¶50. Then, without any further notice or opportunity to respond, Duran announced that A.K. had been suspended for five days. *Id.* at ¶51. Duran made clear this decision had already been made before the meeting. Doc. 56-1, ¶15; Doc. 56-2, ¶9. When Mrs. Moyer asked why, Duran said, "When we see pictures of a 17-year-old holding an assault rifle, it sends panic through our building." FAC ¶52.

Duran and Larson conceded A.K. had not threatened anyone. FAC ¶53. Neither was able to articulate a specific policy that A.K. had allegedly violated. *Id.* at ¶54. The entire discussion centered on the Snapchat post depicting A.K. with a firearm, and specifically the (erroneous) assertion that she was "holding an assault rifle." FAC ¶52, 55. Neither Duran nor Larson mentioned any other features of the post as being relevant to the disciplinary action or as otherwise being of concern, such as the partially visible Confederate flag in the background or the "Muslim" headscarves A.K. and her brother were wearing. *Id.*; Doc. 56-1 ¶16; Doc. 56-2 ¶10. Nor did they mention any other posts or conduct as part of the basis of the action. FAC ¶55; A.K. Decl. at ¶20; K. Moyer Decl. at ¶16; J. Moyer Decl. at ¶13; Doc. 56-1¶16; Doc. 56-2 ¶10.[2]

---

[2]   Earlier in the day on October 10, 2019, A.K. had posted on Snapchat a picture of herself with a scarf wrapped around her head. FAC ¶23. Some students told her they believed the post was "racist." *Id.* at ¶24. A.K. reposted the image with the caption "Allahu akbar [God is great] (I live in America so fuck you if your [sic] offended, I can do what I want." *Id.* at ¶26. When the students complained again, A.K. herself reported the situation to Principal Duran. *Id.* at ¶27. Duran did not say she believed A.K. was attempting to incite conflict with students or that A.K. had violated any school policies; instead, she said A.K. could not be disciplined for the speech and simply advised her to be "more sensitive" about her social medial posts. *Id.* at ¶¶28-30; Doc. 56-1 ¶¶9-10.

The first time defendants cited any specific basis for A.K.'s suspension was in a letter Principal Duran emailed Mrs. Moyer later that day, October 11, 2019. *See* FAC, Ex. B. This letter alleged that A.K.'s speech constituted "*[b]ehavior on or off school property which is detrimental to the welfare, safety, or morals of other students or school personnel*" and thus violated CCSD Policy JKD-1-E and JICDA and C.R.S. § 22-33-106(1)(c). The letter did not mention Policy JICED. It also did not explain how A.K.'s post was "detrimental" to anyone's "welfare, safety, or morals" or state that the post "substantially disrupted" or "interfered with" any school operations.

A.K. served the first day of her suspension on October 11th, and the remainder from October 21st to October 24th. FAC ¶62. In response to a later grievance, defendants issued a letter stating the suspension would be upheld. Ex. 2 to Decl. of K. Moyer. The basis for the discipline cited in this letter was that A.K. had "posted pictures and texts online," which caused some students to "voice their concern" about "the posts' contents" (without describing the "pictures," "texts," or "contents" of concern) and others to stay home from school on October 11, 2019. *Id.* It cited JKD-1-E and JICDA as the policies violated, with no mention of JICED.

### III.   ARGUMENT

#### A.  A.K. Has Plausibly Alleged Defendants' Actions Violated Her Free Speech Rights.

Principal Duran punished and restricted A.K.'s speech because of what it contained. Such content-based speech restrictions, which "target speech based on its communicative content," "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Even a "generally applicable" rule is subject to strict scrutiny if it is applied to a speaker "because of what his speech communicated"—that is, if the speaker is covered by the rule

"because of the . . . content of his particular message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Defendants cannot show that restricting A.K.'s speech furthers a compelling interest or is narrowly tailored to achieve that interest. Nor does A.K.'s speech fit within one of the narrow exceptions to this First Amendment protection, such as for true threats. Her message promoted gun safety, responsibility, and the enjoyment and lawful exercise of constitutionally protected rights.

In *Tinker v. Des Moines Indep. School Dist.*, the Supreme Court articulated a narrow exception to normal speech protections, permitting schools to regulate in-school student speech that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school" or intrudes on "the rights of other students." 393 U.S. 503, 508, 513 (1969). Since *Tinker*, the Supreme Court has identified three other kinds of speech schools may regulate: lewd, vulgar, or indecent speech at school, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), school-sponsored speech, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), and nonpolitical speech "[a]t a school-sanctioned and school-supervised event" that "promot[es] illegal drug usage," *Morse v. Frederick*, 551 U.S. 393, 396 (2007). A.K.'s speech—published on the Internet, about lawful activity unrelated to her school—falls into none of these categories.

The *Tinker* Court itself stressed that, "[i]t can hardly be argued that . . . students . . . shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. Certainly then, students do not lose their free speech rights far outside the schoolhouse gate, in their own homes. Whatever increased authority school authorities may have over student speech in school, they do not have round-the-clock authority over the entirety of their students' lives.

Rather, "a student's free speech rights outside the school context are coextensive with the rights of an adult." *J.S. ex rel. Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 932 (3d Cir. 2011) (en banc).

In *J.S.*, the en banc Third Circuit recognized students' broad rights to engage in off-campus speech, even speech sharply critical of school officials. Eighth-grade student J.S. was suspended for posting a MySpace page that directly targeted her school principal for mockery with insulting, lewd, and sexually explicit content. *Id* at 920. The court held the suspension violated the First Amendment and could not be justified under either *Fraser* or *Tinker*. *Id.* at 930-32.

The same is true here. Even assuming *Tinker* applies, A.K.'s speech did not create any objectively reasonable likelihood of substantial disruption or material interference in the school. Even if some parents declined to send their children to school for a day because of it, such subjective concerns about nonthreatening speech cannot justify suppressing it: "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. . . . Any variation from the majority's opinion may inspire fear. . . . But our Constitution says we must take this risk." *Tinker*, 393 U.S. at 508. If speech like J.S.'s—which directly targeted a school principal with lewd and offensive messaging—does not reasonably risk causing future disruption, then A.K.'s nonvulgar political speech which did not reference the school does not either. *See also Longoria Next Friend of M.L. v. San Benito Ind. Consol. School Dist.*, 942 F.3d 258, 269 (5th Cir. 2019) (off-campus student speech cannot be subjected to discipline "simply because an administrator considers it 'offensive, harassing, or disruptive'").

Threatening speech may sometimes be punishable. *See, e.g., D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766 (8th Cir. 2011). But A.K. made no threats. The mere picture of a gun, in the context of safe and lawful firearm use, along with an expression of gratitude

for the First and Second Amendments, is no threat. *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) (discussed below).

This case is nothing like the *West* case defendants cite. MTD 7-8, 9-10. There, the school had been contending with racial conflict over an extended time; it adopted a policy expressly prohibiting students' use of the Confederate flag for any non-educational purposes while at school; during this same period the student involved was disciplined "numerous" times, including for racially-charged behavior; he was fully aware of the policy; and yet he drew a Confederate flag on a piece of paper during class. *West v. Derby Unified School Dist. No. 260*, 206 F.3d 1358, 1361 (10th Cir. 2000). Most notably, "the district had a reasonable basis for forecasting disruption from display of such items *at school*." *Id.* at 1366 (emphasis added) (quoting and adopting district court's reasoning, which repeated "at school" three times in the same paragraph). And in *Spero*, which defendants also cite, MTD 8-9, the student who posted the Snapchat video depicting a gun had just recently been disciplined for a vulgar insult to a teacher during class, and his video was captioned, "Guidette with a strap." *Spero v. Vestal Cent. Sch. Dist.*, 427 F. Supp. 3d 294, 300-01 (N.D.N.Y. 2019). This is unlike A.K.'s situation, where there is no history of prior discipline, and no violent overtones to her message about *safe* and *responsible* exercise of constitutional rights.

## B. A.K. Has Plausibly Alleged Unconstitutional Deterrence of Her Future Speech.

Defendants have been unmistakably clear: A.K. must refrain from making political statements that defendants find disagreeable, or she will be further punished. Defendants said so in writing, and have shown throughout this litigation that their ideological disagreement with her speech, and their unreasonably subjective concerns about her speech, directly underlie the

disciplinary action they took against her. Defendants assert that A.K.'s speech was rightly restricted because other students disagreed with it. MTD 7.

Indeed, defendants argue that the depiction of semiautomatic firearms—coupled with the presence of the "racially divisive" Confederate flag and "Muslim" headscarves (features they never mentioned before being sued)—was "highly inflammatory," "alarming," and "offensive," in particular because classmates "reacted negatively" to A.K.'s prior posts earlier that day. *Id.* But that is not how constitutional rights work. Vague assertions that others have been offended do not supply the needed justification to silence speech. If they did, *Cohen v. California* would have turned out quite differently. 403 U.S. 15, 22 (1971) (that the words "Fuck the Draft" on the jacket Cohen wore in a courthouse might have upset others and potentially spurred a "violent reaction" could not, "consistently with constitutional values" justify "a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression").

Defendants also (only now) emphasize A.K.'s use of the phrase "Allahu akbar" in a previous post, describing it as "an Arabic religious phrase that has been appropriated by jihad terrorists." *Id.* But they do not allege that A.K. was using the phrase as a jihadist, nor that anyone thought so; the phrase, used by millions of peaceful Muslims, simply means "God is great." Defendants cannot justify suspending a minor from school for such speech—especially when this allegation is among a set of evidently post-hoc justifications that defendants never raised until being sued.

And again, such concerns about potentially offensive or disfavored words do not justify censorship. The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise

8

of individual dignity and choice upon which our political system rests." *Cohen*, 403 U.S. at 25. Even "in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." *Id.*

Defendants assert that the October 11th letter from the School District to A.K. does not chill future speech, and that she has failed to allege "any specific message A.K. has been discouraged from posting, and the October 11th letter on its face does not purport to impose any content-based restriction on future speech; it only discourages misconduct in general." MTD 9. But the letter expressly states that "any further incidents will result in additional consequences." FAC ¶¶60, 71. And it was written and sent as a direct response to A.K.'s Snapchat post, not as a general statement about misconduct applicable to all students. The context makes clear that future speech like A.K.'s Snapchat post is forbidden—apparently as well as any other posts containing the features about which defendants *now* put forth as additional justifications for the discipline, such as "Muslim" headscarves, "racially divisive" symbols like the Confederate flag, or Muslim phrases used by "jihad terrorist[s]." *See* Doc. 56-1 ¶¶21-25, 56-2 ¶¶17-19 (detailing how the prior discipline and warning of further discipline has stifled A.K.'s engaging in such speech).

And, as explained above, the speech that the letter deters is constitutionally protected. Just as the previous enforcement of the District's policies violated A.K.'s constitutional rights, so too does the threat of future enforcement. Taking the facts in the light most favorable to the plaintiff, A.K. has alleged more than enough to show her speech has been chilled.

## C. A.K. Has Plausibly Alleged Unconstitutional Overbreadth.

Principal Duran's letter explaining why A.K. had been suspended cited CCSD Policy JKD-1-E, CCSD Policy JICDA, and C.R.S. § 22-33-106. JKD-1-E essentially mirrors C.R.S. § 22-33-

106(1)(c) in subjecting students to disciplinary suspension for engaging in "[b]ehavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel." The JICDA policy also prohibits "[b]ehavior on or off school property that is detrimental to the welfare, safety, *or morals* of other students or school personnel." JICDA ¶19 (emphasis added). And while that appears on its face limited to "activities while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity," Principal Duran's letter treats JICDA as applying to non-school-sponsored speech posted from home. Ex. B to FAC.

"[T]he overbreadth doctrine enables litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally pro-tected speech or expression.'" *Hill v. Colorado*, 530 U.S. 703, 731-32 (2000) (citations omitted). This principle applies to overbroad government agency policies as well. *See, e.g.*, *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, 1234 (D. Kan. 1998) (evaluating a school policy for overbreadth, and concluding that it "would likely be overbroad" had it not been narrowed by school administrators' practices), *aff'd*, 206 F.3d 1358 (10th Cir. 2000).

To illustrate, in *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, the Fourth Circuit struck down as unconstitutionally overbroad a school policy that banned clothing with "messages . . . that relate to . . . weapons," apparently just on school grounds. 354 F.3d 249, 255, 259-60 (4th Cir. 2003). The policy, the court noted, could reach even "lawful, nonviolent, and nonthreatening symbols of not only popular, but important organizations and ideals." *Id*. at 259-60. The CCSD policies are even more clearly overbroad because they cover speech at home and because their

sweeping, nebulous terms could capture speech on *any* subject matter—not just as to weapons—that may strike any given school official as "detrimental" to "welfare," "safety," or "morals."

In capturing such broad swaths of nondisruptive, nonvulgar speech far outside school-sponsored activities—and indeed outside school itself—through the unbridled judgment of school officials as to what is "detrimental," CCSD's policies extend far beyond the limited speech re-strictions upheld in *Tinker*, *Fraser*, *Hazelwood*, and *Morse*. This is an even broader range of speech than that forbidden by the overbroad harassment ban struck down in *Saxe v. State College Area School District*, 240 F.3d 200 (3d Cir. 2001) (Alito, J.). And, of course, even "immoral" ideas are protected by the Constitution; even against the denial of a modest benefit (such as trademark reg-istration). *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). Immoral ideas are likewise protected against the threat of suspension or expulsion from school, especially when conveyed from the student's own home without any mention of the school, teachers, staff, or other students.

Defendants argue that "[a]n overbreadth challenge on First Amendment grounds is to be employed 'only as a last resort . . . when the law may have a chilling effect on the free speech rights of parties not before the court.'" MTD 14 (quoting *West*, 206 F.3d at 1367). But in light of the school's actions as to A.K., and the school's arguments in this very case, the policies would indeed chill other students' speech. Few classmates, knowing what happened to A.K., would feel free to write about their personal choice to exercise their Second Amendment rights, or to disagree with various religious beliefs (even without hatred or vulgarity), or even to use religious phrases that may be viewed as controversial or provocative. And this deterrence of speech is exacerbated by the policies' vagueness, which "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

Nor can JICDA be saved by the proviso that it "shall not infringe upon constitutionally protected rights." MTD 14-15. "The exception from criminal prosecution under [a] statute for speech or expression protected by the First Amendment does not cleanse the statute of constitutional overbreadth concerns." *Matter of Welfare of A.J.B.*, 929 N.W.2d 840, 851 (Minn. 2019); *see also Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996) (same). "Application of the [saving clause] on a case-by-case basis would require people of ordinary intelligence—and law enforcement officials—to be First Amendment scholars. . . . Because First Amendment doctrines are often intricate and/or amorphous, people should not be charged with notice of First Amendment jurisprudence, and a First Amendment defense cannot by itself provide adequate guidelines for law enforcement. Moreover, an attempt to charge people with notice of First Amendment case law would undoubtedly serve to chill free expression." *Long*, 391 S.W.2d at 295. This applies just as much to the JICDA proviso, which fails to adequately guide students and school officials.

**D.  A.K. Has Plausibly Alleged That the Law Is Void for Vagueness.**

"Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (citation omitted). When speech is restricted, a "vague regulation," including a vague school policy, "is constitutionally infirm in two significant respects." *Stephenson v. Davenport Comm. School Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). First, "a regulation 'violates the first essential of due process of law' by failing to provide adequate notice of prohibited conduct" to people "of common intelligence." *Id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Second, "the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement." *Id.* (citing *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). "'A vague

law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution

on an ad hoc and subjective basis.'" *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09

(1972)). This applies equally to school officials. *See also Taylor v. Roswell Indep. Sch. Dist.*, 713

F.3d 25, 50 (10th Cir. 2013) (applying void-for-vagueness analysis to a school policy).[3]

CCSD's JICDA and JKD-1-E policies, and C.R.S. § 22-33-106(1)(c) (which JKD-1-E mir-

rors) all fail to afford people of "common intelligence," let alone high school students, a reasonable

opportunity to understand what speech is permitted and what speech is punishable as "detrimental"

to "welfare or safety" or "welfare, safety, or morals." Indeed, the JICDA policy expressly applies

only to conduct "on school grounds, in school vehicles, or during a school-sponsored activity."

Yet defendants cite it as a basis for disciplining A.K. for speech off school grounds, outside of

school vehicles, not during a school-related activity. What is a high school student to make of that?

In *Stephenson*, the court struck down as unconstitutionally vague a school ban on "gang

symbols." It noted that they "take many forms and are constantly changing"; "[a]ccordingly, the

District must 'define with some care' the 'gang related activities' it wishes students to avoid. The

regulation, however, fails to define the term at all and, consequently, fails to provide meaningful

guidance for those who enforce it." 110 F.3d at 1310. The same applies here: society's judgment

about what speech harms "welfare, safety, or morals" is constantly changing, indeed from person

---

[3] *People in Interest of K.P.*, 182 Colo. 409, 413-14 (1973), rejected a vagueness challenge to part of one of these standards—behavior "inimical[l] to the welfare, safety, or morals"—but did not involve speech, and is thus inapposite under the "more stringent vagueness test" applied to policies that "interfere[] with the right of free speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

to person. To punish such speech, the District must "define with some care" what speech supposedly jeopardizing welfare, safety, or morals "it wishes students to avoid." But the policies "fail[] to define the term[s] at all and, consequently, fail[] to provide meaningful guidance for those who enforce [them]." *Id.* A.K. had no way of knowing how or why defendants would view her post as "detrimental" to "welfare, safety, or morals," and has no way of knowing what future posts on similar topics would likewise be punishable. *See* Doc. 56-1 ¶23, Doc. 56-2 ¶18.

### E.   A.K. Has Plausibly Alleged a Violation of Her Procedural Due Process Rights.

As defendants acknowledge, *before* being disciplined, the student is entitled to (1) "'notice of the charges against [her],'" (2) "'an explanation of the evidence the authorities have,'" and (3) "'an opportunity to present [her] side of the story.'" MTD 10 (quoting *Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045, at \*19 (D. Colo. 2017)). "The charges" were the allegations that A.K. violated Policies JKD-1-E and JICDA, and C.R.S. § 22-33-106. Yet those were not even identified until Principal Duran issued the letter on the evening of October 11, 2019—after she had imposed the suspension. FAC ¶54. And only now, months later, defendants are citing Policy JICED as another policy A.K. supposedly violated. MTD 14. That is not "notice."

Nor was there any meaningful "explanation of the evidence" defendants assert against her. The only thing ever cited as evidence against her, before this lawsuit, was Principal Duran's assertion during the meeting on October 11th that A.K. was "holding an assault rifle" (which is incorrect) in the Snapchat post, and assertions in the grievance denial letter two weeks later about unspecified "contents" of "posts" and "texts" online that caused "concern." And only now, defendants are citing a host of additional circumstances as "evidence" against A.K.—the allegedly

14

"inciting" nature of the two prior Snapchat posts, the "Muslim" headscarf she wore, her use of "jihad terrorist" language, and her standing before a Confederate flag.

Lastly, A.K. had no opportunity to present her side of the story because the decision was made before A.K. ever arrived for the meeting at which Principal Duran announced the suspension. FAC ¶51; Doc. 56-1 ¶15; Doc. 56-2 ¶9. The later grievance process did not somehow serve as a viable substitution, as defendants suggest. MTD 11. A.K. was entitled to this process *before* being disciplined—before the damage was done. *Goss v. Lopez*, 419 U.S. 565, 581 (1975).

### F. Superintendent Siegfried and Ms. Duran Are Proper Defendants.

Defendants argue that only the School District is a proper defendant here. MTD 4-5. But 42 U.S.C. § 1983 permits claims against "*every person*, who under color of any statute, ordinance, regulation, custom, or usage" is responsible for violating a claimant's rights (emphasis added). Defendant Siegfried, as Superintendent, served as a "final policy making authority" by presiding over the District's operations, and by possessing authority to override A.K.'s suspension. *Seamons*, 206 F.3d at 1029; FAC, Ex. A. And as the authority directly responsible for initiating A.K.'s suspension, FAC ¶51, Principal Duran is an agent acting under color of law under 42 U.S.C. § 1983. (Plaintiffs do not object to dismissal of the School Board as a separate defendant.)

### IV.   CONCLUSION

Defendants' motion to dismiss must be denied.

Respectfully Submitted,

/s/ *Joseph G.S. Greenlee*
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org
Attorney for Plaintiff

15